# Matter of J-S-, Respondent

*Decided by Attorney General May 15, 2008*

U.S. Department of Justice
Office of the Attorney General

(1)  The spouse of a person who has been physically subjected to a forced abortion or sterilization procedure is not per se entitled to refugee status under section 601(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996,  Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-689, codified at section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42) (2000).  The holdings to the contrary in *Matter of S-L-L-*, 24 I&N Dec. 1 (BIA 2006); *Matter of C-Y-Z-*, 21 I&N Dec. 915 (BIA 1997), overruled.

(2)  Persons who have not physically undergone a forced abortion or sterilization procedure may still qualify as a refugee on account of a well-founded fear of persecution of being forced to undergo such a procedure, or on account of persecution or a well-founded fear of persecution for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, or on other grounds enumerated in the Immigration and Nationality Act.

FOR RESPONDENT:  Jianhua Zhong, Esquire, Flushing, New York; Samuel Estreicher, Esquire, New York, New York

AMICI CURIAE:  Charles A. Rothfeld, Esquire, Washington, D.C.

FOR THE DEPARTMENT OF HOMELAND SECURITY:  Gus P. Coldebella, Acting General Counsel

## BEFORE THE ATTORNEY GENERAL
(May 15, 2008)

On September 4, 2007, pursuant to his authority under 8 C.F.R. § 1003.1(h)(1)(i) (2006), Attorney General Gonzales directed the Board of Immigration Appeals to refer to him for review its decision in *Matter of J-S-* (BIA 2006).  The Board's decision was then stayed pending a decision by the Attorney General.  For the reasons set forth in the accompanying opinion, I overrule the Board's decisions in *Matter of C-Y-Z-*, 21 I&N Dec. 915 (BIA 1997) (en banc), and *Matter of S-L-L-*, 24 I&N Dec. 1 (BIA 2006) (en banc), to the extent those decisions hold that the spouse of a person who has been physically subjected to a forced abortion or sterilization procedure is per se

entitled to refugee status under section 601(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-689, codified at section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42) (2000). In light of this change in the applicable legal framework, I vacate the Board and Immigration Judge decisions denying respondent's claims for relief and remand this case for further proceedings consistent with this opinion.

## OPINION

On September 4, 2007, Attorney General Gonzales directed the Board of Immigration Appeals, pursuant to 8 C.F.R. § 1003.1(h)(1)(i) (2006), to refer to him for review the Board's decision in this matter. This case was certified for Attorney General review in order to provide a final administrative ruling on a statutory question that has divided the Federal courts of appeals. As explained below, that question is whether section 601(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-689 ("IIRIRA"), codified at section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42) (2000) ("the Act"), can be read to confer automatic or presumptive (hereinafter "per se") refugee status on the spouses of persons who have physically been subjected to a forced abortion or sterilization procedure pursuant to a foreign government's coercive population control program, such as China's "One Couple, One Child" program. The Board held that the provision could be read to confer such status in decisions from 1997, *Matter of C-Y-Z-*, 21 I&N Dec. 915 (BIA 1997) (en banc) ("*C-Y-Z-*"), and 2006, *Matter of S-L-L-*, 24 I&N Dec. 1 (BIA 2006) (en banc) ("*S-L-L-*"), but that determination has not been addressed in an opinion by the Attorney General.

After considering the text, structure, history, and purpose of the Immigration and Nationality Act as amended by IIRIRA, as well as the relevant administrative and judicial decisions and the briefs submitted, I conclude that the Department of Justice should not adhere to the Board's decisions in *C-Y-Z-* and *S-L-L-*. I therefore overrule the Board's decisions in *C-Y-Z-* and *S-L-L-* to the extent those cases hold that the spouse of a person who has been physically subjected to a forced abortion or sterilization procedure is per se entitled to refugee status under section 601(a) of IIRIRA. Furthermore, for the reasons stated below, I vacate the Immigration Judge's decision in this case and remand for reconsideration consistent with this opinion.

Section 601(a) of IIRIRA defines the circumstances in which the enforcement against a person of a coercive population control program

constitutes "persecution on account of political opinion" and thus qualifies that person for political asylum under the Act.  Section 601(a) amended the Act to state:

> For purposes of determinations under this Act, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

Section 101(a)(42) of the Act.

The year after section 601(a) was enacted, the former Immigration and Naturalization Service ("INS") stipulated, and the Board held, that section 601(a) provides per se refugee status not only to persons who have physically undergone forced abortion or sterilization procedures, but also to the spouses of such persons.  *See Matter of C-Y-Z-*, *supra*.  This determination later was questioned by the INS and by some courts, *see, e.g.*, *Cai Luan Chen v. Ashcroft*, 381 F.3d 221, 226 (3d Cir. 2004) (Alito, J.), and in 2005 the United States Court of Appeals for the Second Circuit directed the Board to explain the basis for its decision in *C-Y-Z-*, *see Shi Liang Lin v. U.S. Dep't of Justice*, 416 F.3d 184, 191-92 (2d Cir. 2005) ("*Lin I*").

In 2006, a divided Board reaffirmed the interpretation it adopted in *C-Y-Z-* on the grounds that (i) section 601(a) is ambiguous and (ii) interpreting the provision to confer per se refugee status to the spouses of persons who physically undergo forced abortion or sterilization procedures best accords with congressional intent.  *See Matter of S-L-L-*, *supra*.  Sitting en banc, the Second Circuit reversed *S-L-L-*, holding that section 601(a) "is unambiguous and . . . does not extend automatic refugee status to spouses or unmarried partners of individuals § 601 expressly protects."  *Shi Liang Lin v. U.S. Dep't of Justice*, 494 F.3d 296, 300 (2d Cir. 2007) (en banc) ("*Lin II*").  The Second Circuit's ruling created a circuit split because it conflicted with decisions of other courts of appeals that had deferred to the Board's interpretation of section 601(a) in *C-Y-Z-* as reasonable.  *Id.*; *see infra* note 3.

In this case, respondent is a married Chinese national whose wife remains in China.  He seeks political asylum in the United States under section 601(a) because his wife allegedly was forced to undergo an "involuntary sterilization" procedure.  Section 101(a)(42) of the Act.  Applying *C-Y-Z-* and *S-L-L-*, the Immigration Judge agreed with respondent that section 601(a) provides refugee status to men whose spouses are forced to undergo abortion or involuntary sterilization procedures, but denied his application on the ground

that the procedure performed on his wife (forced insertion and monitoring of an intrauterine device ("IUD")) was not a "sterilization" procedure covered by the statute. Respondent appealed this decision to the Third Circuit, which, upon learning of the Second Circuit's decision in *Lin II*, sua sponte ordered en banc consideration and asked the Department to brief whether it adheres to the Board's interpretation of section 601(a) or whether it joins the Second Circuit in rejecting the Board's construction of section 601(a).

After receiving the Third Circuit's request for supplemental briefing, Attorney General Gonzales directed the Board, pursuant to 8 C.F.R. § 1003.1(h)(1)(i) (2006), to refer to him for review the Board's decision in this matter.[1] The Attorney General's order certifying this case for review directed the parties to submit briefs addressing

> all relevant statutory questions, including, but not limited to, whether IIRIRA § 601(a) . . . is ambiguous or silent on the availability of refugee status for spouses or partners of individuals who have been subjected to forced abortion or sterilization, and whether the BIA interpretation of section 601(a) in *Matter of C-Y-Z-*, 21 I&N Dec. 915 (BIA 1997) and *In re S-L-L-*, 24 I&N Dec. 1 (BIA 2006) is correct.

In addition to the briefs I received from the parties, I received two amicus briefs in support of respondent.[2]

Respondent's reliance on section 601(a) presents the key question in this case: whether the Department of Justice should adhere to the Board's interpretation of that provision as conferring per se refugee status on the spouses of persons who have physically been subjected to a forced abortion or sterilization procedure. After considering the text, structure, history, and purpose of the Act as amended by IIRIRA, as well as the relevant administrative and judicial decisions and the briefs submitted, I conclude, as stated above, that it should not. I therefore overrule the Board's decisions in *C-Y-Z-* and *S-L-L-* to the extent those cases hold that the spouse of a person who has been physically subjected to a forced abortion or sterilization procedure is per se entitled to refugee status under section 601(a) of IIRIRA. It is important to emphasize that this decision does not prevent the spouse of a person who has physically undergone a forced abortion or sterilization procedure from qualifying for political asylum under section 601(a)'s

---

[1] The Third Circuit entered a final order dismissing respondent's appeal after the court received notice of Attorney General Gonzales's decision to conduct further administrative review of this case.

[2] Brief of Amici Representative Chris Smith and Former Representative Henry Hyde, Sponsors and Drafters of Section 601 of the Illegal Immigration Reform and Immigrant Responsibility Act; Brief of Amici the United States Conference of Catholic Bishops, Advocates International, the Jubilee Campaign, and the National Advocacy Center of the Sisters of the Good Shepherd.

"failure," "refusal," "other resistance," or "well founded fear" provisions set forth above, or from obtaining asylum under other provisions of the Act, if that person satisfies the relevant statutory criteria. My decision holds only that spouses are not entitled to the same per se refugee status that section 601(a) expressly accords persons who have physically undergone forced abortion or sterilization procedures.

Accordingly, and for the reasons stated below, I vacate as no longer necessary to the determination of respondent's claims the Immigration Judge's decision that the procedures performed on respondent's wife are not "sterilization" procedures that support per se asylum under section 601(a), and remand respondent's claims for reconsideration consistent with this opinion.

## I.

Respondent was placed in removal proceedings after entering the country without being admitted or paroled. He conceded removability but applied for political asylum, withholding of removal to China, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) (hereinafter "Convention Against Torture" or "CAT"). At respondent's 2004 hearing before the Immigration Judge, he testified that Chinese officials prevented him and his wife from having more than one child by forcing his wife to submit to medical insertion of an IUD and to report for periodic medical visits to confirm the IUD's continued presence and effectiveness. Respondent said he was at home when the officials forcibly removed his wife in order to insert the IUD, but that he "didn't want to interfere" because he did not want to further jeopardize his wife. After the IUD was inserted in 1993, respondent on three separate occasions requested permission from the Chinese family planning officials to have another child, but his requests were denied each time. After the last denial in 1995, respondent "gave up hope" and used false documents to enter the United States in 2001.

On November 8, 2004, the Immigration Judge denied respondent's request for asylum and withholding of removal. Respondent's evidence of past persecution and a well-founded fear of future persecution consisted of documents and testimony, which the Immigration Judge found "credible," that he and his wife were fined for marrying below the age prescribed by China's coercive population control program; that his wife was forced to submit to the insertion and monitoring of an IUD shortly after their son was born; that family planning officials warned him that, if he and his wife tried to have

another child, they would abort the pregnancy and permanently sterilize respondent or his wife as they had allegedly sterilized respondent's sister and mother; and that respondent expected to be "fined" and/or "incarcerated" if returned to China because he could not prove that he left the country legally.

In her oral decision, the Immigration Judge emphasized respondent's testimony that he came to the United States partly "for financial reasons," as well as his admissions that he (i) "did not violate [China's] birth control planning policies" and (ii) "waited some eight years after the events in question before . . . coming to the United States." The Immigration Judge stated further that respondent had provided no evidence that, "during the eight years that he remained in the People's Republic of China . . . *he* was the victim of any persecution or repercussions," such as arrest, "that would establish any past persecution on account of any enumerated ground" in the Act or IIRIRA. The Immigration Judge explained:

> In this particular case, the only one reality appears to be that [respondent's] wife was forced to undergo insertion of an intrauterine device. And, it's clear that this, in and of itself, cannot be the basis to establish a claim for asylum based on past persecution. The forcible insertion of an intrauterine device is not tantamount to sterilization nor to abortion. . . . While the concept of [respondent's] wife being forced to undergo an insertion of an intrauterine device may be repugnant, offensive, even unlawful, or unfair, and may be viewed as such by some individuals, this, in and of itself, does not constitute persecution *per se*, and does not meet the definition of refugee.

Accordingly, the Immigration Judge denied respondent's application for asylum and ordered him removed to the People's Republic of China.

On February 24, 2006, the Board affirmed the Immigration Judge's decision without opinion and respondent appealed to the Third Circuit. Respondent's appeal was fully briefed and scheduled for submission to a panel when, in July 2007, the Second Circuit issued its en banc decision rejecting *C-Y-Z-*'s and *S-L-L-*'s per se rule of spousal eligibility and departing from the decisions of several courts of appeals that had deferred to the Board's interpretation of section 601(a) in *C-Y-Z-*.[3] *See Lin II*, 494 F.3d at 300.

The Second Circuit in *Lin II* reversed the Board's interpretation of section 601(a) in *C-Y-Z-* and *S-L-L-*, concluding, as other circuits had not, that the text of section 601(a) is neither silent nor ambiguous on the question of spousal eligibility. Accordingly, the Second Circuit did not focus on whether the

---

[3] *See, e.g.*, *Chen Lin-Jian v. Gonzales*, 489 F.3d 182, 188 (4th Cir. 2007); *Junshao Zhang v. Gonzales*, 434 F.3d 993, 1001 (7th Cir. 2006); *Wang He v. Ashcroft*, 328 F.3d 593, 604 (9th Cir. 2003); *Guang Hua Huang v. Ashcroft*, 113 Fed. Appx. 695, 700 (6th Cir. 2004) (unpublished opinion); *Gong Fu Li v. Ashcroft*, 82 Fed. Appx. 357, 358 (5th Cir. 2003) (unpublished per curiam opinion).

Board's per se rule was "a permissible construction" of the statute under step two of the interpretive framework in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). Instead, *Lin II* concluded that section 601(a)'s forced abortion and sterilization provisions unambiguously foreclose an interpretation that accords per se refugee status to the spouses of persons who physically undergo such procedures. *See Lin II*, 494 F.3d at 305, 309. Having reached this conclusion based on section 601(a)'s text, the court declined to defer to the Board's interpretation, although the court did observe in dictum that the legislative history and policy on which the Board relied also did not support the Board's reading of the statute. *See id.* at 312-13.

After ordering en banc consideration of respondent's appeal, the Third Circuit directed the parties to brief whether that circuit should "adopt any or all of the reasoning announced in" *Lin II*. *See J-S- v. Att'y Gen. of the United States*, No. 06-1952 (3d Cir. July 27, 2007). Respondent urged the Third Circuit to defer to the Board's interpretation of section 601(a) in *C-Y-Z-* and *S-L-L-* and reject the Second Circuit's reasoning in *Lin II*. The Government did not file a response because the Third Circuit dismissed respondent's appeal following receipt of Attorney General Gonzales's certification order.

## II.

Respondent appeals the Immigration Judge and Board decisions denying his application for asylum solely under section 601(a) of IIRIRA.[4] The key question in this case is whether the Department of Justice should adhere to the Board's interpretation of section 601(a) in *C-Y-Z-* and *S-L-L-* as conferring per se refugee status on the spouses of persons who have physically been subjected to a forced abortion or sterilization procedure. For the reasons stated in this opinion, I conclude it should not.

---

[4] The only alternative claim respondent raised below was a claim under the Convention Against Torture. In order to qualify for protection from removal under the CAT, an applicant must establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2) (2008). The Immigration Judge concluded that respondent did not satisfy this standard, and respondent does not challenge this determination in his current brief.

## A.

An alien seeking political asylum in the United States must establish that he or she is a refugee. Section 208(b)(1)(A) of the Act, 8 U.S.C. § 1158(b)(1)(A) (2000). Section 101(a)(42) of the Act defines a "refugee" as

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country *because of persecution* or a well-founded fear of persecution *on account of* race, religion, nationality, membership in a particular social group, or *political opinion*.

Section 101(a)(42) of the Act (emphases added).

As noted, section 601(a) of IIRIRA amended section 101(a)(42) of the Act to specify the circumstances in which victims of coercive population control programs could qualify for political asylum:

> For purposes of determinations under this Act, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, *shall be deemed to have been persecuted on account of political opinion*, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

*Id.* (emphasis added). Section 601(a) thus created four new and specific classes of refugees:

1. "person[s] who ha[ve] been forced to abort a pregnancy";
2. "person[s] who ha[ve] been forced . . . to undergo involuntary sterilization";
3. "person[s] . . . who ha[ve] been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program"; and
4. "person[s] who ha[ve] . . . a well founded fear that [they] will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance."

The third and fourth categories above specifically accord refugee status to persons who have not physically undergone forced abortion or sterilization procedures if such persons can prove (i) past persecution for "fail[ing] or refus[ing]" to "undergo" a forced abortion or sterilization procedure; (ii) past persecution for some "other resistance" to a coercive population control program; or (iii) a "well founded fear" that they will be forced to undergo an abortion or involuntary sterilization procedure, or will be persecuted for failing or refusing to undergo such a procedure or for otherwise "resisting" a coercive population control program. Persons such as respondent thus may be able to qualify for asylum under these categories upon an appropriate factual showing.

The question remains, however, whether persons such as respondent—i.e., persons who have not physically undergone a forced abortion or sterilization procedure—can also qualify for asylum under the first and second categories above. Respondent argues that they can, and that he personally qualifies for asylum under category two ("forced . . . to undergo involuntary sterilization"), pursuant to the per se rule of spousal eligibility set forth in *C-Y-Z-* and *S-L-L-*. That rule begins with the uncontroversial proposition that categories one and two accord per se refugee status to any individual who has physically undergone a forced abortion or sterilization procedure because all such persons should be presumed to have been persecuted for resisting a coercive population control program. However, the rule goes on to encompass the much more doubtful proposition, which respondent invokes here, that the *spouse* of any individual who physically undergoes one of the referenced procedures is *also* entitled to per se refugee status. Respondent defends this position on the ground that section 601(a)'s text is silent on the question of spousal eligibility, and accordingly should be construed to permit his claim of past persecution under the "joint spousal persecution" theory underlying the Board's per se rule.[5] The Department of Homeland Security ("DHS") contends that I should adopt the Second Circuit's reasoning in *Lin II* and conclude that the text of the relevant provision unambiguously forecloses respondent's claim and compels reversal of the interpretation set forth in the Board decisions in *C-Y-Z-* and *S-L-L-*.

The text of section 601(a) is the first, and most important, basis for my rejection of the per se rule of spousal eligibility the Board adopted in *C-Y-Z-* and *S-L-L-*. The "language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose" cut strongly against the statutory interpretation respondent urges and the Board has adopted. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). Section 601(a)'s forced sterilization provision refers to "*a person* who has been forced to . . . *undergo* involuntary sterilization." Section 101(a)(42) of the Act (emphases added). Consistent with ordinary usage and the Act's definition of the term, "a person" refers to "an individual" and, specifically here, the individual who has "undergo[ne]" the sterilization

---

[5] According to this theory, a forced abortion or sterilization procedure performed on one spouse should be "'imputed'" to the other spouse because the procedure causes both spouses emotional and other suffering, and because "'the law considers'" the "'reproductive opportunities'" of one spouse "'to be bound up'" with the "'reproductive opportunities'" and harms of the other. *See Matter of S-L-L-*, *supra*, at 8 (quoting *Cai Luan Chen v. Ashcroft*, 381 F.3d 221, 226 (3d Cir. 2004)).

procedure at issue. *See* Section 101(b)(3) of the Act, 8 U.S.C. § 1101(b)(3) (2000) (defining the term "a person" for purposes of title I of the Act, which includes section 101(a)(42), to mean "an individual or an organization"); *Lin II*, 494 F.3d at 311 ("[T]he language Congress employed in § 601(a)['s forced abortion and sterilization provisions] demonstrates that it wanted to cover 'a person,' not 'a couple,' not a 'significant other' and not an 'intimate friend.'"). Furthermore, "undergo" means "to submit to," *e.g.*, *Merriam Webster's Collegiate Dictionary* 1288 (10th ed. 1994), and in the medical context, a person who "undergoes" a procedure is the person upon whom the procedure is *physically* performed, *see, e.g.*, Milton Hollenberg et al., *Predictors of Postoperative Myocardial Ischemia in Patients Undergoing Noncardiac Surgery*, JAMA, vol. 268, no. 2 (July 8, 1992); *Lin*, 494 F.3d at 305-06. Accordingly, reading section 601(a)'s involuntary sterilization provision to refer only to persons who have themselves undergone forced sterilization procedures interprets the statute in the manner that gives its words "their 'ordinary or natural' meaning," whereas interpreting it to include spouses does not. *E.g.*, *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (quoting *Smith v. United States*, 508 U.S. 223, 228 (1993)); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987) ("With regard to this very statutory scheme [the Act], we have considered ourselves bound to '"assume that the legislative purpose is expressed by the ordinary meaning of the words used."'" (quoting *INS v. Phinpathya*, 464 U.S. 183, 189 (1984) (quoting *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982)))).

The same may be said of the statute's reference to "a person forced to abort a pregnancy." For the reasons set forth above, this clause is properly read to refer to the person physically forced to abort the pregnancy (the would-be mother) because the clause refers to "a person forced to abort a pregnancy," and not to "a couple" or "a married couple" forced to do so. Section 601(a)'s subsequent description of an abortion as a "procedure" that "a person" is forced to "undergo" further supports this reading. Because this latter description of a forced abortion can naturally be read only to refer to *one* person—the person upon whom the "procedure" is physically performed—it would be inconsistent with the text and structure of section 601(a) to read the opening clause on abortion to encompass *two* people (the would-be mother and the would-be father). *See, e.g.*, *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (stating that it is a "cardinal rule that a statute is to be read as a whole since the meaning of statutory language, plain or not, depends on context" (citation omitted)); *Davis v. Michigan Dep't of Treas.*, 489 U.S. 803, 809 (1989) (same). As the Second Circuit explained in *Lin II*, "Congress's specific designation of some persons (i.e., those who fear, resist, or undergo particular medical procedures)" as refugees eligible for political asylum "is incompatible with the view that others (e.g., their spouses) should also be granted asylum

*per se*" regardless whether they fall within one of the specific refugee classes enumerated in the statute. *Lin II*, 494 F.3d at 307 ("The inclusion of some obviously results in the exclusion of others."). Had Congress wanted to include spouses in section 601(a)'s forced abortion and sterilization provisions, "'it could simply have said so.'" *Id.* at 305 (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 7 (2000)).

The foregoing textual evidence that section 601(a)'s forced abortion and sterilization clauses extend refugee status only to those persons who have physically undergone the referenced procedures is bolstered by reading section 601(a) in harmony with other provisions of the Act conferring refugee status. *See, e.g.*, *King v. St. Vincent's Hosp.*, 502 U.S. at 221. The per se rule of spousal eligibility the Board attributes to section 601(a) is difficult to reconcile with the Act's separate and express provision specifying that "spouse[s]" of persecuted individuals are eligible for derivative asylum if such spouses do not themselves qualify as refugees, but *only* if they "accompany[], or follow[] to join," the alien who is eligible for, and is actually granted, asylum. Section 208(b)(3)(A) of the Act. Interpreting section 601(a) to confer per se refugee status on *all* spouses of persons who have undergone forced abortion or sterilization procedures, even spouses who do not themselves qualify as refugees and are *not* accompanied by a qualifying alien, circumvents with an implied rule the requirements for derivative asylum that the Act expressly sets forth in section 208(b)(3)(A).

Such an interpretation of section 601(a) also departs from, and creates tension with, the Act's general requirement that every applicant for personal asylum (as distinct from statutorily prescribed derivative asylum) must establish *his or her own* eligibility for relief under specific provisions of the statute. *See* section 208(b)(1)(B)(i) of the Act (providing that the "burden of proof is on the applicant" to "establish that *the applicant* is a refugee" (emphasis added)); *INS v. Elias-Zacarias*, 502 U.S. 478, 482 (1992) (stating that "'persecution on account of . . . political opinion' in § 101(a)(42) is persecution on account of the *victim's* political opinion," not on account of the political opinion of someone else). The interpretation of section 601(a) I adopt in this opinion avoids this "critical defect" in the Board's per se rule because it does not "effectively absolve[] large numbers of asylum applicants of the statutory burden to prove" that they themselves have either been persecuted, or have a well-founded fear of being persecuted, on account of their political opinion. *Lin II*, 494 F.3d at 308.

In concluding that section 601(a) does not support the per se rule of spousal eligibility the Board adopted in *C-Y-Z-* and *S-L-L-*, I recognize that section 601(a) does not explicitly exclude spouses from its purview. I also recognize that several courts, along with the Board, emphasized this in accepting various arguments for interpreting section 601(a) in a manner that brings spouses

within the purview of the provision's forced abortion and sterilization clauses. The starting point for all such arguments is that, because section 601(a) does not expressly address the refugee status of spouses one way or the other, it is improper to conclude that the statute unambiguously forecloses interpretations that would support the per se rule of spousal eligibility the Board adopted in *C-Y-Z-*.

Any *court* that accepted this starting point was limited to reviewing whether the Board's approach represented a "reasonable" interpretation of the statute, *see Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, which some courts concluded it was.[6] My review of the Board's interpretation of section 601(a), however, is not so limited. The appellate courts that reviewed the per se rule established in *C-Y-Z-* were bound to accept the Board's interpretation of section 601(a) if they concluded that that interpretation was not "unambiguously foreclosed" by the statutory text and could be considered "reasonable" under the broad standard applied by the Supreme Court. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980, 983 (2005). My review of Board decisions, by contrast, is plenary. *See, e.g.*, section 103(a)(1) of the Act, 8 U.S.C. § 1103(a)(1) (Supp. IV 2004) ("[T]h[e] determination and ruling by the Attorney General with respect to all questions of law shall be controlling."); *Matter of D-J-*, 23 I&N Dec. 572, 575 (A.G. 2003) (Attorney General's review of a Board decision is de novo; delegated authority of the Board is superseded and Attorney General is "authorized to make the determination based on [his] own conclusions on the facts and the law"). Accordingly, I need not opine on the circuit split regarding the proper outcome of *Chevron*'s two-step *judicial*

---

[6] These courts appear to have reached this conclusion based on one of two theories. First, that "'the forced sterilization [or abortion procedure performed on] a wife could be "imputed" to her husband, "whose reproductive opportunities the law considers to be bound up with those of his wife."'" *Matter of S-L-L-*, *supra*, at 8 (quoting Judge Alito's panel opinion in *Cai Luan Chen*, 381 F.3d at 226 (quoting *Jie Lin v. Ashcroft*, 356 F.3d 1027, 1041 (9th Cir. 2004), in which the Ninth Circuit concluded that forced sterilization of a wife could reasonably be "imputed" to her husband, "whose reproductive opportunities the law considers to be bound up with those of his wife")). And, second, that "persecution of one spouse by means of a forced abortion or sterilization causes the other spouse to experience intense sympathetic suffering that rises to the level of persecution." *Matter of S-L-L-*, *supra*, at 7 (stating that "the ruling in *Matter of C-Y-Z-* is plausibly based on" the theory of "sympathetic suffering" the Third Circuit identified in *Cai Luan Chen*, as well as on the fact that the "PRC Government explicitly imposes joint responsibility on married couples for decisions related to family planning" such that its decision to "force an abortion or sterilization" can reasonably be considered "persecut[ion] [of] the married couple as an entity"); *see also Cai Luan Chen*, 381 F.3d at 225-26 (citing cases in which the "'mental suffering'" that an asylum seeker endured from "'being forced to witness the pain and suffering of'" a close family member constituted persecution of the asylum seeker (quoting *Abay v. Ashcroft*, 368 F.3d 634,642 (6th Cir. 2004))).

test for reviewing Board decisions in order to reverse the *C-Y-Z-* and *S-L-L-* interpretation of section 601(a) as erroneous.

As I have explained, I reach this result first and foremost because neither *C-Y-Z-* nor *S-L-L-* addresses what I consider to be the proper reading of section 601(a)'s plain text. Indeed, *C-Y-Z-* did not even decide the issue of per se spousal eligibility for asylum as a contested issue. *See Matter of C-Y-Z-*, *supra*, at 918 (concluding that "the applicant in this case has established eligibility for asylum by virtue of his wife's forced sterilization" because "[t]his position is not in dispute"). The Board simply based its ruling on the INS's stipulation that the "'husband of a sterilized wife can essentially stand in her shoes,'" *id.*, even though "[n]either the [INS] brief nor the General Counsel's memorandum set[] forth the reasoning behind this position on 'joint spousal persecution,'" *id.* at 928 (Filppu, concurring and dissenting). Although DHS has abandoned the INS's prior support for *C-Y-Z-*'s per se rule on spousal eligibility as inconsistent with section 601(a)'s text and purpose, *S-L-L-* reaffirmed *C-Y-Z-* on the grounds that *C-Y-Z-* was (i) "long standing" precedent to which courts and Congress have deferred and (ii) consistent with the "policy" and "intent" behind section 601(a). *Matter of S-L-L-*, *supra*, at 4-8. Neither of these grounds persuades me to affirm the per se rule of spousal eligibility the Board majority embraced in *S-L-L-*.

Respect for precedent is undeniably important for any adjudicative body. But it does not prevent the Department of Justice from reversing administrative decisions when there is good reason for doing so. Indeed, the Supreme Court has emphasized that one of the primary purposes of *Chevron* deference is to allow agencies to do just that. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. at 981-82 (stating that courts must defer to agency interpretations as those interpretations evolve in response to, inter alia, "changed factual circumstances" or "reversal of agency policy"); *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. at 863-64 (emphasizing that an "agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis"). Accordingly, that several courts have deferred to the Board's interpretation of section 101(a)(42) of the Act as amended by IIRIRA does not alter my decision to reverse that interpretation as unsupported by the provision's text, structure, history, and purpose.[7]

My decision is similarly unaffected by the fact that Congress, presumptively aware of the Board's interpretation of section 601(a), in 2005 amended the statutory limit on the number of refugees who may be admitted

---

[7] In addition, because it is important that administration of the Act be consistent throughout the country, administrative stare decisis principles carry less weight where, as here, Federal courts have divided on whether an administrative decision is correct and entitled to deference.

pursuant to section 601(a), but did not otherwise alter the provision's text. *See* REAL ID Act of 2005, Div. B of Pub. L. No. 109-13, § 101(g)(2), 119 Stat. 231, 305 (repealing former section 207(a)(5) of the Act, 8 U.S.C. § 1157(a)(5) (2000)). Because "Congress takes no governmental action except by legislation," what respondent and others view as Congress's 2005 acquiescence-by-inaction in the statutory interpretation espoused in *C-Y-Z-* could also, to use the Supreme Court's words, "appropriately be called Congress's failure to express any opinion" on the then-current agency interpretation of the statute. *Rapanos v. United States*, 547 U.S. 715, 749-50 (2006) (emphasizing the Court's "oft-expressed skepticism towards reading the tea leaves of congressional inaction"); *see also Matter of S-L-L-*, *supra*, at 14 n.2 (Pauley, concurring) ("I do not read into [Congress's recent] elimination [of the annual cap] congressional *approval* of *Matter of C-Y-Z-*, but instead merely a practical recognition that, over the years, the unrealistically low cap had produced an unhealthy backlog of applicants awaiting permanent asylee status, including those women and men who *themselves* had been forcibly sterilized or aborted."). Moreover, even if the lack of congressional reaction to *C-Y-Z-* were to undercut the argument that section 601(a) "unambiguously forecloses" the Board's interpretation for purposes of *Chevron* deference, it "does not definitively mean that Congress intended to protect spouses," *Lin II*, 494 F.3d at 323 (Katzmann, J., concurring in the judgment), and certainly does not require section 601(a) to be read to accord spouses per se refugee status. Accordingly, nothing in Congress's 2005 inaction precludes my interpretation of section 601(a).

The Board's discussion of section 601(a)'s "policy" and "intent" also does not persuade me to support its per se rule of spousal eligibility. *See Matter of S-L-L-*, *supra*, at 5-8. Asserting that section 601(a)'s text provides "no clear or obvious answer to the scope of" its protections, *id.* at 4, the majority in *S-L-L-* reasoned that the per se rule in *C-Y-Z-* can be justified based on an examination of the provision's purpose in light of the "nexus and level of harm" the Act requires for asylum:

> When considered in light of the reasons Congress expanded the refugee protections to include persecution based on coercive family planning, and the well-established principles regarding nexus and level of harm for past persecution, we understand the husband, as well as the wife, to have been subjected to the coercive family planning policy when the government forces an abortion [or sterilization] on a married couple.

*Id.* at 6. I disagree.

The "nexus and level of harm" to which the Board refers is the connection (nexus) that section 101(a)(42) of the Act requires between an asylum seeker's "race, religion, nationality, membership in a particular social group, or political opinion" and the persecution (level of harm) that he or she suffered

or has a well-founded fear of suffering "on account of" such characteristics, membership, or opinion. In 1989 and 1993, the Board held that persecution on account of a person's response to a coercive population control program does not establish eligibility for asylum under section 101(a)(42) because such persecution is not "on account of . . . political opinion" or any other ground enumerated in the statute. *See Matter of Chang*, 20 I&N Dec. 38 (BIA 1989); *Matter of G-*, 20 I&N Dec. 764, 778 (BIA 1993). In response to these decisions, *see* H.R. Rep. 104-469(I), at 173-74 (1996), Congress passed the language in section 601(a) of IIRIRA that amended section 101(a)(42) to state that a person "*shall be deemed* to have been persecuted on account of political opinion" if that person was forced (or has a well-founded fear of being forced) to "undergo" an abortion or sterilization "procedure" *or* if he or she was (or has a well-founded fear of being) persecuted for "failure or refusal to undergo such a procedure *or* for *other resistance* to" a coercive population control program. Section 101(a)(42) of the Act (emphases added).

The relationship between the foregoing language and the underlying "nexus and level of harm" that section 101(a)(42) of the Act requires is clear. Section 601(a) "deem[s]" the nexus and level of harm required for political asylum under section 101(a)(42) to be satisfied if "a person" has been, or has a well-founded fear of being, "persecuted" for engaging in various forms of "resistance" to a coercive population control program. Section 101(a)(42) of the Act; *see also* REAL ID Act, § 101(g)(2), 199 Stat. at 305 (characterizing section 601(a)'s amendment to section 101(a)(42) of the Act as a provision for "persons *resisting* coercive population control" (emphasis added)). The reason section 601(a) makes an applicant's "resistance" to a coercive population control program the trigger for refugee status is obvious: If mere enforcement of a coercive population control program were the trigger, most of China's population would qualify as refugees under the provision. That is not what section 601(a) provides. Section 601(a) extends political asylum to persons who have been, or who have a well-founded fear of being, "persecuted on account of" their "resistance" to a coercive population control program. Section 101(a)(42) of the Act. It then spells out that certain specific persons—namely, persons who are "forced to undergo" abortion or sterilization "procedure[s]" required by a coercive population control program—are per se considered to have engaged in the kind of "resistance" necessary for asylum. *Id.* By contrast, persons who cannot show they have undergone such procedures must prove persecution or a well-founded fear of persecution for "fail[ing] or refus[ing]" to undergo such procedures or for some "other resistance" to a coercive population control program to qualify as refugees. *Id.*

The fatal flaw in the per se approach to spousal eligibility under section 601(a) is that it ignores the foregoing analysis and simply assumes the

requisite statutory "nexus and level of harm" in *all* cases where the asylum seeker is married to a person who was forced to undergo an abortion or involuntary sterilization procedure. Section 601(a) does not permit this blanket assumption for good reason: Some spouses may not have "resisted," and in fact may have affirmatively supported, the forced abortion or sterilization procedure that was performed on the spouse who remains in China. Such applicants should not (and as I read section 601(a) cannot) use the sole fact of their spouse's persecution automatically to qualify for political asylum under the statute's coercive population control "resistance" provisions. Instead, such applicants must present proof, of which their spouse's treatment may be a part, of persecution for refusing to undergo forced abortion or sterilization procedures or for engaging in "other resistance" to a coercive population control program, or of persecution on account of another ground for asylum enumerated in the Act. The Board recognized the point that not all spouses oppose coercive procedures in *S-L-L-* and insisted that the rule it announced in *C-Y-Z-* "was not intended to, and does not, include" cases where the applicant supported or acquiesced in the coercive procedure physically performed on his or her spouse. *Matter of S-L-L-*, *supra*, at 8. This assertion, however, does not accord with the Board's holding that, "*absent* evidence" that the spouse seeking asylum affirmatively supported or acquiesced in the coercive procedure performed on his or her partner, the Board will continue to "interpret the forced abortion and sterilization clause of section [601(a)], in light of the overall purpose of the amendment, to include both parties to a marriage."[8] *Id*. (emphasis added) (expressly rejecting an approach that would require some demonstrable resistance by one spouse to the other spouse's abortion or sterilization for that spouse to qualify for direct asylum in his or her own right under section 601(a)).

---

[8] I agree with Board Member Filppu that the above-referenced flaw in the Board's approach is "further illustrated in its treatment of 'boyfriends, fiancés, and other unmarried partners.'" *Matter of S-L-L-*, *supra*, at 19 (Filppu, concurring and dissenting) (quoting the majority opinion at 8). As Member Filppu explains, the Board "rel[ies] on its construct of family entity persecution" to "craft[ ] a rule that treats a father as 'a person who has been forced to abort a pregnancy' if the father is both legally married to the woman who was forced to undergo such a procedure and if the father opposed the abortion." *Id*. However, the majority never justifies "how a father ceases to be 'a person' forced to abort a pregnancy when it comes to unmarried"—or, to complicate the situation further, divorced or otherwise separated—partners. *Id*. Although the Board provides plausible "policy reasons for 'drawing the line at marriage,' and for refusing to extend to a boyfriend or fiancé 'the nexus and level of harm' it attributes to a husband," I agree with Member Filppu that this "entire discussion is only necessary because of the underlying [joint spousal] rule it invents in the first place." *Id*. (quoting the majority opinion at 9).

In cases where the physically persecuted spouse remains in China, there will rarely be affirmative evidence that the spouse seeking per se refugee status supported or failed to resist the coercive procedure at issue. Moreover, unless Immigration Judges presume that the Chinese Government is aware of what would normally be a "private family dispute" over whether the physically victimized spouse should submit to an abortion or sterilization procedure required by a coercive population control program, it is "impossible to understand" the Board's conclusion that the Chinese Government's use of such abortion and sterilization procedures should be understood to "punish 'the married couple as an entity' *only* in those cases where there is joint opposition to the abortion [or sterilization]." *Matter of S-L-L*, 24 I&N Dec. at 17 (Filppu, concurring and dissenting) (emphasis added) (noting that the majority's concession that certain spouses fall outside the per se rule is fundamentally in tension with its assertion that section 601(a)'s forced abortion and sterilization clauses pertain to "the married couple as an entity").

For all the foregoing reasons, I conclude that, at least as to political asylum or withholding of removal claims predicated on the enforcement of coercive population control programs,[9] the ordinary meaning of the statutory term "resistance," coupled with the text of section 101(a)(42) of the Act, as amended by IIRIRA, and settled principles of asylum law, does not support the per se rule of spousal eligibility the Board adopted in *C-Y-Z-* and reaffirmed in *S-L-L-*. This conclusion, like the text of section 601(a) itself, simply reflects the logic of limiting per se refugee status to persons who have physically undergone a coercive birth control procedure. As the Board itself conceded in *S-L-L-*, *unlike* a person who has physically undergone a *forced* abortion or sterilization procedure, the spouse of such a person *may or may not* have "resist[ed]" the procedure (and, thus, the coercive population control program pursuant to which the procedure was performed) in the manner the Act requires for asylum. *Matter of S-L-L-*, *supra*, at 8 (conceding that "*C-Y-Z-* was not intended to, and does not," provide "asylum for husbands who were not, in fact, opposed to a spouse's abortion"). If this is true, which the text, structure, history, and purpose of the relevant statutory provisions demonstrate

---

[9] I agree with DHS that what the Act means by the phrase "persecution on account of . . . political opinion" is a "complex issue that need not be fully resolved here" because this case does not concern the application of that phrase in contexts other than political asylum claims predicated on "persecution" for "resisting" a coercive population control program. Accordingly, I confine my analysis to that context, and do not purport to address whether the phrase would support a per se rule in other contexts such as, for example, Judge Calabresi's hypothetical in which the Board interprets section 101(a)(42) to support a rule that "any child who sees his parents tortured and murdered before him by a totalitarian government—say, the Nazis—is persecuted, and therefore eligible for asylum." *Lin II*, 494 F.3d at 335 (Calabresi, J., concurring and dissenting).

it is, the spouse of the physical victim of such a procedure is *not* someone who can be considered per se to have faced, or to have a well-founded fear of facing, "persecution" "on account of" "resisting" a coercive population control program under section 101(a)(42) of the Act based solely on the fact that he or she is married to the victim. *See Lin II*, 494 F.3d at 309-10; *Matter of C-Y-Z-*, *supra*, at 928-29 (Filppu, concurring and dissenting).

Accordingly, from now on,[10] the Board and Immigration Judges shall cease to apply the per se rule of spousal eligibility articulated in *C-Y-Z-* and *S-L-L-*

---

[10] In his concurrence in *S-L-L-*, Board Member Pauley stated that although he believed *C-Y-Z-* "was wrongly decided," he would not overrule it because "it is too late in the day for the Board to upset the apple cart" and overruling the decision could enable DHS to "seek termination of [existing grants of] asylum under section 208(c)(2)(A)" of the Act on the grounds that the new interpretation constitutes a "fundamental change in circumstances." *Matter of S-L-L-*, *supra*, at 14 & n.2 (Pauley, concurring).

I agree with the en banc Second Circuit that reversal of the statutory interpretation set forth in *C-Y-Z-* should not be considered a "fundamental change in circumstances" that would allow DHS to terminate existing final grants of asylum under the regulations implementing section 208(c)(2)(A) of the Act. *See Lin II*, 494 F.3d at 314 (stating that the regulations permit DHS to seek the termination of asylum when an alien no longer qualifies for refugee status "'because, owing to a fundamental change in circumstances relating to the original claim, the alien's life or freedom no longer would be threatened on account of . . . political opinion *in the country from which deportation or removal was withheld*'" (quoting 8 C.F.R. § 208.24(b)(1))). Specifically, just as courts have concluded that a "change in United States asylum law does not qualify as a 'change in circumstances' sufficient to reopen an asylum case under 8 C.F.R. § 1003.2(c)(3)(ii)" based on "changed circumstances arising in the country of nationality," my reversal of the Board's interpretation of section 601(a) should "not be seen as a 'fundamental change in circumstances'" under 8 C.F.R. § 208.24(b)(1) that allows the termination of asylum claims that have already been granted. *Lin II*, 494 F.3d at 314; *see also Matter of S-L-L-*, *supra*, at 21 n.2 (Filppu, concurring and dissenting) ("We are not now concerned with reopening past cases.").

My decision overruling the per se rule of spousal eligibility in *C-Y-Z-* and *S-L-L-* does, however, apply to all cases pending now or in the future before asylum officers, the Immigration Judges, or the Board, and to cases pending on judicial review. My decision also applies to cases in which a motion to reconsider is filed within 30 days of a final decision. *See Matter of O-S-G-*, 24 I&N Dec. 56, 57 (BIA 2006) ("A motion to reconsider is a '"request that the Board reexamine its decision in light of additional legal arguments, a change of law, or perhaps an argument or aspect of the case which was overlooked."'" (quoting *Matter of Ramos*, 23 I&N Dec. 336, 338 (BIA 2002) (quoting *Matter of Cerna*, 20 I&N Dec. 399, 402 n.2 (BIA 1991)))). And my decision applies to cases in which a final ruling on asylum or withholding of removal was issued prior to the date of this opinion if such cases are later reopened for reasons unrelated to the reasoning in this opinion. By contrast, my decision shall not serve as the sole basis for reopening cases where a final grant of asylum or withholding of removal has been made, and is subject only to the procedures of 8 C.F.R. §§ 1003.1(d)(6) and 1003.47 where applicable, if the time for seeking reconsideration or judicial review has expired or such opportunities for administrative or judicial review have already been exhausted.

and shall instead engage in a case-by-case assessment of whether a section 601(a) applicant who has not physically undergone a forced abortion or sterilization procedure can demonstrate that (i) he or she qualifies as a refugee under section 601(a) on account of persecution for "failure or refusal" to undergo such a procedure or for "other resistance" to a coercive population control program; (ii) he or she has a well-founded fear of being forced to undergo an abortion or involuntary sterilization procedure or of being persecuted for failing or refusing to undergo such a procedure or for "other resistance" to a coercive population control program; (iii) the specific facts of his or her case justify asylum on grounds other than those articulated in section 601(a); or (iv) he or she satisfies the requirements for derivative asylum expressly set forth in section 208(b)(3)(A) of the Act.

### B.

Respondent and amici contend that, notwithstanding the analysis above, I should affirm the Board's per se rule of spousal eligibility on policy grounds they argue are reflected in section 601(a)'s legislative and enforcement history. I disagree. To the extent this history is relevant to the proper interpretation of section 601(a), it, like section 601(a)'s underlying policy goals, are more consistent with my interpretation than with the Board's interpretation.

In reaching this conclusion, I considered the portions of the legislative history identified in the briefs, including the brief submitted by Representatives Smith and Hyde. For several reasons, this history does not alter my decision. Most notably, section 601(a)'s legislative history does not expressly address whether the spouse of a person subjected to a forced abortion or sterilization procedure is entitled to per se refugee status. The Smith/Hyde Brief's references to House Report and floor discussion regarding "couples" or "women and men . . . fleeing from forced abortion" indicate that some in Congress expected the new provision to benefit both members of a couple where each member is able to satisfy the Act's requirements for asylum. But these references say nothing about whether Congress intended a person presumptively to qualify for asylum solely on the ground that a spouse had been physically subjected to one of the coercive procedures specified in the legislation.[11] *See, e.g.*, H.R. Rep. No. 104-469(I), at 174-75 (1996) (referring to "*a person* who has been compelled to undergo an abortion

---

[11] The reference in the House Report to the Board's decision in *Matter of G-*, *supra*, is not to the contrary. The applicant in that case did not base his request solely on the threatened sterilization of his wife, but rather on his fear that he himself would be subjected to sterilization and other punishment (including a fine that had already been imposed on him for having a second child) based on his violation of China's family planning policy. *See id.* at 774, 778.

or sterilization, or has been severely punished for refusal to submit to such a procedure," as well as to "women . . . subjected to involuntary abortions" and "men and women" who may be "forcibly sterilized," and concluding that "[t]he United States should not deny protection to *persons subjected to such treatment*") (emphases added); *see also S-L-L-*, 24 I&N Dec. at 18 (Filppu, concurring and dissenting) (noting that the legislative history of section 601(a), to the extent it focuses on particular individuals at all, appears to have focused on women, not their spouses or partners, when addressing the issue of extending refugee status to victims of forced procedures) (citing sources). If anything, the House Report counsels against interpreting section 601(a) as conferring per se refugee status on the spouses of persons expressly covered by the provision because the report declares that section 601(a) does *not* change the Act's general requirement that applicants prove eligibility for direct asylum on an individual basis:

> The Committee emphasizes that the burden of proof remains on the applicant, *as in every other case*, to establish by credible evidence that *he or she* has been subject to persecution—in this case, to coercive abortion or sterilization—or has a well-founded fear of such treatment. . . . Section [601(a)] is not intended to protect persons who have *not actually been subjected to* coercive measures or specifically threatened with such measures . . . .

H.R. Rep. No. 104-469(I), at 174 (emphases added).

Respondent and amici contend also that section 601(a) should be interpreted in light of the content of an earlier bill and proposed regulations that were previously (and unsuccessfully) offered in response to the same Board decisions section 601(a) ultimately addressed. Such proposals, however, lack the force of law, and the Supreme Court has counseled against relying upon failed legislative proposals. *See, e.g.*, *Rapanos v. United States*, 547 U.S. at 749. Nonetheless, I will address these failed proposals briefly because the parties have raised them and because they further support my interpretation of section 601(a).

The failed bill at issue is the Emergency Chinese Immigration Relief Act of 1989 ("ECIR"). Section 3(a) of that bill, which was vetoed by the President, would have required that "careful consideration shall be given to . . . an applicant who expresses a fear of persecution upon return to China related to China's 'one couple, one child' family planning policy," and would have directed that "[i]f the *applicant* establishes that *such applicant* has refused to abort or be sterilized, *such applicant* shall be considered to have established a well-founded fear of persecution . . . on the basis of political opinion." H.R. 2712, 101st Cong. § 3(a) (1989) (emphases added). Section 3(b) of ECIR would then have required the Attorney General to promulgate regulations

providing that an applicant shall be considered to have established a well-founded fear of persecution if the applicant establishes that

> (1) the applicant (*or applicant's spouse*) has refused to abort a pregnancy or resisted sterilization in violation of China's family planning policy directives, *and* (2) . . . in the case of an applicant for asylum or refugee status, there is good reason to believe that *the applicant* will be required to abort the pregnancy or to be sterilized or will otherwise be persecuted if the applicant were returned to China.

*Id.* § 3(b) (emphases added).

This failed bill language, which expressly references "spouse[s]" who "refuse[] to abort a pregnancy or resist[] sterilization," shows at most that if Congress wanted to cover spouses in section 601(a)'s forced abortion and sterilization clauses, it knew how to do so. The language does *not* show a "clearly expressed legislative intention" in ECIR—much less in the different language that Congress enacted as section 601(a) several years later—to confer per se refugee status on the spouses of persons who undergo forced abortion or sterilization procedures. *INS v. Cardoza-Fonseca*, 480 U.S. at 432 n.12 (quoting *United States v. James*, 478 U.S. 597, 606 (1986)). Rather, the provisions above suggest that, even had ECIR been enacted, it would *not* have been enough for an applicant merely to show that his spouse endured a forced abortion or sterilization procedure; the applicant would *also* have had to show that *he* would likely be subjected to a coercive procedure or would otherwise be persecuted if returned to his country of origin. Thus, even assuming the failed ECIR legislation is relevant to interpreting section 601(a), *but see Rapanos v. United States*, 547 U.S. at 749, that legislation does not establish the proposition respondent and amici advance—namely, that Congress clearly intended section 601(a) to confer per se refugee status on any applicant who is married to someone who has undergone a forced abortion or sterilization procedure.[12] Accordingly, I disagree that the failed legislative proposal and

---

[12] Similarly, the various Executive Branch documents cited by respondent and amici do not alter my interpretation of section 601(a). Those documents consist primarily of a 1990 executive order directing the Secretary of State and the Attorney General to grant "enhanced consideration" to claims of persecution based upon a country's policy of forced abortion or coerced sterilization, Exec. Order No. 12711, 3 C.F.R. § 283 (1991), and a putative final (but never published) Justice Department rule intended to advance the policy expressed in the executive order. The most recent (1993) version of that rule would have provided:

> An applicant (and the applicant's spouse, *if also an applicant*) shall be found to be a refugee on the basis of past persecution on account of political opinion if *the applicant* establishes that, pursuant to the implementation . . . of a family planning policy that involves or results in forced abortion or coerced sterilization, *the applicant*

(continued...)

Executive Branch rules that preceded section 601(a) support the per se rule in *C-Y-Z-*, and conclude instead that this history supports the interpretation of section 601(a) in this opinion.

I view the policy goals underlying section 601(a) the same way. I understand that the purpose of section 601(a) was to *expand* the asylum relief available to victims of coercive population control programs who had been denied relief under the Board's 1989 and 1993 decisions, and I agree that application of coercive population control procedures may constitute "obtrusive government interference into a married couple's decisions regarding children and family" that may have "a profound impact on both parties to the marriage," *Matter of S-L-L-*, *supra*, at 6-7. The construction of section 601(a) set forth in this opinion, however, does not foreclose spouses from obtaining asylum on a case-by-case basis even if they are not accompanied by their physically persecuted partners. The one thing I reject is a rule that does not accord with the statutory text and that extends to these spouses the same per se refugee status that section 601(a) facially affords those who have physically undergone the coercive procedures referenced in the statute. *See supra* Part II.A.

My conclusion on this point is bolstered by DHS's decision to abandon the INS's previous support for *C-Y-Z-*'s interpretation of section 601(a), and by the Second Circuit's observation in *Lin II* that "hundreds of cases in the courts illustrate" that the Board's per se rule has had the unforeseen effect of allowing "a married man to 'capitalize on the persecution of his wife to obtain asylum even though he has left his wife behind and she might never join him and he might intend that she not do so.'" *Lin II*, 494 F.3d at 312 (quoting *He Chun Chen v. Ashcroft*, 376 F.3d 215, 223 n.2 (3d Cir. 2004)). Although many husbands may genuinely intend eventually to bring their wives and children to the United States, the numerous cases that the Second Circuit and DHS reference suggest that this is not always true. The behavior in such cases

---

(...continued)

> has been forced to abort a pregnancy or to undergo sterilization or has been persecuted for failure or refusal to do so.

Att'y Gen. Order No. 1659-93, at 13-14 (Jan. 15, 1993) (emphases added).

Nothing in this never-published rule, however, unambiguously provides that an applicant establishes refugee status solely by being married to a non-accompanying spouse who was subjected to a forced abortion or sterilization procedure. Indeed, the preamble to the rule indicates that the rule would *not* have addressed that situation, and, like section 208(b)(3)(A) of the Act, contemplates derivative asylum for spouses only if the physically persecuted person was a successful applicant for asylum. Att'y Gen. Order No. 1659-93, at 5 (stating that "[a]t least in the situation provided for in the rule, in which a directly threatened person is an applicant for relief *along with* his or her spouse, affording such relief to both is warranted" (emphasis added)).

should not be rewarded, particularly when the Act already provides a means for husbands and wives to obtain asylum together or seriatim, including through derivative asylum. *See id.*; section 208(b)(3)(A) of the Act. As DHS and the Second Circuit have emphasized, the existing (and express) derivative asylum provision in section 208(b)(3)(A) "encourage[s] the preservation of families," whereas the Board's interpretation "has the perverse effect of creating incentives for husbands to leave their wives."[13] *Lin II*, 494 F.3d at 312.

## III.

Having rejected the per se, or joint spousal, eligibility rule articulated in *C-Y-Z-* and *S-L-L-*, I consider respondent's claims under section 601(a). Because respondent seeks refugee status under section 601(a) but has not physically undergone a forced abortion or sterilization procedure, resolution of his claims requires a careful examination of the record to determine whether respondent (i) "resisted" China's coercive population control program, (ii) suffered or has a well-founded fear that he will suffer "persecution" by the Chinese Government, and (iii) can show that such persecution was inflicted, or that he has a well-founded fear that it would be inflicted, "on account of" his resistance to the coercive population control program.

I decline to make these complex and fact-specific determinations in the first instance, and instead vacate the Immigration Judge's decision that the procedures performed on respondent's wife are not "sterilization" procedures supporting per se asylum within the meaning of section 601(a) and remand this case for further proceedings consistent with this opinion. I remand so that the Board or Immigration Judge can reconsider, as necessary, respondent's claims (including his claim that he has a well-founded fear of future persecution based on, among other things, Chinese family planning officials' threats to sterilize him personally) in light of the facts in the record, respondent's testimony, which the Immigration Judge expressly found "credible," and the legal

---

[13] Although I reject the per se rule articulated in *C-Y-Z-* and *S-L-L-*, the interpretation of section 601(a) I adopt in this opinion allows both members of the "spousal unit" to begin the asylum effort in the United States, either by coming here together or by having one lead and the other follow. The only difference between my interpretation and the per se rule for purposes of who initiates the asylum effort is that, in cases where the spouse who begins the asylum effort is the spouse who was *not* physically subjected to a forced abortion or sterilization procedure, that spouse must be able to establish his or her personal eligibility for asylum on the facts of his or her own case. As the Second Circuit noted in *Lin II*, "that [the applicant's] spouse has been subjected to a forced abortion or sterilization would *not* be irrelevant" to this determination. *Lin II*, 494 F.3d at 313 (emphasis added). This fact would simply not allow the applicant, if he or she left the physically persecuted spouse behind, to qualify for per se refugee status.

framework I announce in this opinion. I vacate the Immigration Judge's holding on whether forced insertion of an IUD constitutes "sterilization" under section 601(a) because that determination is no longer necessary to this case.[14] The Immigration Judge was required to decide whether the procedures performed on respondent's wife constitute "sterilization" procedures under section 601(a) because the per se rule for spousal eligibility was controlling precedent when the Immigration Judge issued her decision. My reversal of the Board's per se rule alters the legal framework that governs respondent's claims by refocusing the evaluation of his eligibility for asylum on the merits of *his* experience and fears, rather than on a determination whether procedures performed on his *wife* constitute "sterilization" under the statute. Accordingly, I remand respondent's claims for reconsideration and do not—because I need not—decide whether the forced insertion and monitoring of an IUD constitutes "sterilization" under section 601(a).[15]

So ordered.

---

[14] In any event, the question whether forced insertion of an IUD constitutes "sterilization" under section 601(a) is already being considered by the Board in more appropriate cases. *See, e.g.*, *Chao Qun Jiang v. Bureau of Citizenship & Immig. Servs.*, 520 F.3d 132 (2d Cir. 2008) (remanding to the Board to consider whether forced insertion of an IUD constitutes "persecution" under the Act); *Ying Zheng v. Gonzales*, 497 F.3d 201 (2d Cir. 2007) (same).

[15] Whether the Board and the courts should remand other cases for reconsideration in light of this opinion depends on the particularized facts of those cases. Where, as here, a case that was decided principally on the basis of the per se rule appears to involve credible evidence of threats or action against the applicant that might support relief under the legal framework set forth herein, but that were not adequately considered or developed before the Immigration Judge, it may be an appropriate exercise of the Board's discretion to order a remand.