# United States Court of Appeals

## For the First Circuit

No. 04-2567

GI KUAN TAI,

Petitioner,

v.

ALBERTO GONZALES,
Attorney General of the United States, ET AL.,

Respondents.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before
Selya, Lynch, and Lipez, Circuit Judges.

William P. Joyce and Joyce & Associates P.C. on brief for
petitioner.
Mark J. Grady, Assistant United States Attorney, and Michael
J. Sullivan, United States Attorney, on brief for respondents.

August 31, 2005

**LYNCH**, **Circuit Judge**.  Petitioner Gi Kuan Tai, a native and citizen of China, seeks review of the denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).  Tai's petition to this court boils down to two claims.  First, Tai alleges that the Board of Immigration Appeals (BIA) erred when it affirmed the Immigration Judge's (IJ's) finding that Tai's testimony was not credible.  The BIA emphasized that, in an initial interview, Tai did not mention the claim which became the basis for his asylum application -- specifically, that the Chinese government forced his wife to undergo compulsory contraception and abortion.  Second, Tai argues that even though he failed to meet long-established requirements for filing ineffective assistance of counsel claims, the BIA erred in refusing to consider his ineffective assistance claim on the merits.  Finding no error, we deny Tai's petition for review.

## I.

Tai entered the United States at Los Angeles International Airport on May 8, 2000, using a counterfeit passport and counterfeit non-immigrant visa, both in the name of Zhao Jian Min.  He was detained by immigration officials, and on May 9, he gave a sworn statement to an Immigration and Naturalization Service (INS)[1] officer.  Asked the purpose of his visit, Tai replied: "I

---

[1]   On March 1, 2003, the relevant functions of the INS were transferred to the Department of Homeland Security, and the INS subsequently ceased to exist.  See Homeland Security Act of 2002,

-2-

come here to make a living.  The American policy is more human [sic] and they respect human rights."  Asked why he left China, he replied:

> My factory closed down and I need to make money.  I opened a restaurant and there are many government restrictions.  I have to pay many taxes and I don't want to pay all this tax.  I want more children.

Tai further stated that he feared going back to China because "if I go back I will have to pay a fine and undergo re-education camp." Finally, asked if he wanted to add anything else to his statement, Tai said: "I have nothing to add.  I am just asking the United States government to let me stay and work in America."  Tai mentioned nothing about his wife being forced to have an abortion.

Two weeks later, on May 23, 2000, another immigration officer interviewed Tai.  Tai stated that he was married, that his wife was in China, and that the couple had one son.  Asked why he had only one child, he replied: "We had another child but the officials made my wife abort [t]his child"; he said the abortion had been performed "three or four years ago."  Asked if he was afraid to return to China, Tai replied that he was, in part because he "would like to have a few more children" and in part because officials would "apprehend me and put me in jail and fine me

---

Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205 (codified as amended at 6 U.S.C. § 291(a)).  Also, Alberto Gonzales was sworn in as Attorney General of the United States on February 3, 2005.  We have substituted him for John Ashcroft, previous holder of that office, as the respondent.  See Fed. R. App. P. 43(c)(2).

-3-

because I fled China illegally." Finally, asked why he had said during the May 9 interview that he did not want to pay taxes in China, Tai explained that he had been laid off from his government job and had subsequently started an eatery; he said the government had assessed taxes on the new business that he thought were unjust, and that that was part of his reason for leaving the country. He added in reference to the May 9 interview: "I was only asked about this information, not about my wife['s] abortion."

On May 7, 2001, Tai filed an Application for Asylum and for Withholding of Removal. In that application, Tai explained that he and his wife were married in 1984 and that after the birth of their son the following year, Chinese family planning authorities forced Tai's wife to have an IUD inserted. In 1996, Tai wrote, his wife became pregnant again despite the presence of the IUD. According to Tai, Chinese officials discovered this during an examination and forced Tai's wife to have an abortion.

Tai wrote that he was "devastated" by the forced abortion. He added: "We knew that there was not much time left for us to have another child so we made plans for me to leave China and come to the United States. . . . I hope that I am granted political asylum so that I can petition for my wife and then we can have more children here."

On January 10, 2003, Tai appeared before the IJ. His testimony at the hearing with respect to his wife tracked the

statements in his asylum application.  He also testified with regard to his financial problems: he stated that under Chinese government policy, he should have been exempt from taxes for three years after losing his job, but that the government nonetheless attempted to tax him when he opened his eatery.  "Because they want me to pay tax I couldn't stay in my home any longer," he testified, "[s]o that's why I came to the United States."  Later in the hearing, he reiterated that he left China because of his finances:

> Q:  Did they close you down for not paying the tax, sir?
>
> A:  Yes.  They, they warn me, if I don't pay the tax they will close . . . my eatery and because of that.  So I closed, I closed my eatery.
>
> . . .
>
> Q:  Is that why you had left China, because you didn't have any work, sir?
>
> A:  Because, because, because I couldn't make a living.  And I'm a law abiding citizen and I worked with my, with my two hands and, to support my family.

Still later, the judge questioned Tai about his initial statement at the airport:

> Q:  Sir, did you tell the authorities when you arrived in the United States . . . why you left China and why you came here?
>
> A:  Yes.  Yes, I told.  Yes, I told everything in Los Angeles.
>
> Q:  What did you tell?  Tell us what you told.
>
> A:  Everything I, I said today here.

At the conclusion of the hearing, the IJ rejected Tai's application for asylum, withholding of removal, and CAT protection. The IJ found that Tai's testimony "cannot be given any credence" because (1) he "consistently lied" in that he used a fake name, a fake passport, and a fake non-immigrant visa upon arrival in the United States; and (2) his failure to mention the abortion and contraception issues during his first interview undermined the trustworthiness of his story. Since Tai's testimony was not fully credible, the IJ found, he needed to offer documentary evidence of his wife's abortion and his tax issues in order to carry his burden of proof, and he had not done so. The IJ noted that Tai had submitted his marriage license, the birth certificates of his wife and son, and a business license for his eatery, but nothing regarding the taxes or the abortion. The IJ concluded that Tai "could obtain those documents" and should have done so.

Based on Tai's lack of credibility and lack of corroborating evidence, the IJ rejected the asylum application. He also concluded that since Tai had not met his burden for asylum, he was by definition ineligible for withholding of removal. Finally, he found that in the absence of any evidence of past or prospective torture, Tai should be denied CAT protection.

On appeal to the BIA, Tai offered "newly discovered evidence" -- translations of the documents the IJ had sought

regarding his tax debts and his wife's compulsory IUD insertion and abortion. Tai argued that his attorney during his initial hearing had failed to translate the documents and submit them to the IJ.

The BIA rejected his appeal and affirmed the IJ's decision on October 22, 2004. The BIA began by noting that while the IJ's credibility analysis had been "minimal," the BIA's own review of the record did not leave it convinced that a mistake had been committed with regard to the adverse credibility finding. It based this conclusion not on the fraudulent documents but solely on Tai's failure to mention the abortion or contraception issues in his initial interview: it found that failure "materially inconsistent" with his later testimony regarding his wife. Given the inconsistency, Tai needed to offer corroborating evidence to carry his burden; he had neither done so nor convincingly explained the absence of corroboration, despite the fact that documents like abortion records are "reasonably available."

The BIA declined to consider Tai's new evidence, saying it reviews only the record as it existed before the IJ. It noted that while Tai claimed his original counsel's negligence was behind his failure to offer corroborating evidence, Tai had not complied with the requirements for ineffective assistance of counsel claims set forth in Matter of Lozada, 19 I. & N. Dec. 637 (BIA 1988). Finally, it noted that Tai had not alleged error in the IJ's denial of CAT relief. This petition for review followed.

-7-

An applicant for asylum bears the burden of establishing his eligibility by proving he is a "refugee" -- that is, by proving past persecution or a well-founded fear of future persecution on account of "race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(b).  A statutory provision added by Congress in 1996 states that anyone "who has been forced to abort a pregnancy or to undergo involuntary sterilization . . . shall be deemed to have been persecuted on account of political opinion."  8 U.S.C. § 1101(a)(42).  The BIA interprets this provision broadly, applying it not only to those forced to undergo abortions but also to their spouses.  In re C-Y-Z-, 21 I. & N. Dec. 915 (BIA 1997); see also Chen v. Gonzales, No. 04-2623, 2005 U.S. App. LEXIS 16908, at *2 (1st Cir. Aug. 12, 2005).

In reviewing denials of asylum and related relief, this court reviews the BIA's decision, the final agency order. Mukamusoni v. Ashcroft, 390 F.3d 110, 119 (1st Cir. 2004).  We examine whether the BIA's findings, including credibility determinations, are supported by substantial evidence in the record.  Da Silva v. Ashcroft, 394 F.3d 1, 4 (1st Cir. 2005); see also INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992).  Under the highly deferential substantial evidence standard, we must uphold the BIA's findings "unless any reasonable adjudicator would be

compelled to conclude to the contrary." <u>Bocova</u> v. <u>Gonzales</u>, 412 F.3d 257, 262 (1st Cir. 2005) (quoting 8 U.S.C. § 1252(b)(4)(B)).

## A.        The BIA's Credibility Determination

Tai makes two arguments with respect to the BIA's adverse credibility determination. First, he says, the BIA rested the finding largely on the fact that he failed to obtain records of his wife's abortion and compulsory contraception. This was improper, Tai argues, because (1) he explained at his hearing that he could not obtain those documents because they are "greatly restricted" by the government, and (2) therefore the BIA's adverse credibility determination was based on unfair expectations of the evidence he could produce. Tai's argument fails because his premise is incorrect: the BIA relied for its adverse credibility finding not on the lack of corroboration but on the fact that Tai did not mention contraception or abortion in his initial interview.[2]

Second, Tai argues that the BIA erred in relying on his failure initially to mention his wife's abortion because adverse credibility findings must be based on discrepancies that "involved the heart of the asylum claim." <u>Borjorques-Villanueva</u> v. <u>INS</u>, 194 F.3d 14, 16 (1st Cir. 1999). He says the BIA's finding here violated that command because it was based on "trivia."

---

[2]   Also, contrary to his assertion on appeal, Tai never explained to the IJ that the documents in question were "greatly restricted." And, of course, Tai later produced those very "greatly restricted" documents and tried to submit them to the BIA.

Tai's reliance on Borjorques-Villanueva is misplaced. The discrepancy relied upon by the BIA quite clearly went to the heart of Tai's claim: it is difficult to imagine what could be more central to a claim of asylum than the question of whether the events on which it was based ever happened. And while one could draw other inferences besides untruthfulness from Tai's failure initially to mention his wife's abortion -- one could surmise, for example, that he did not think it relevant or was embarrassed to discuss it -- the evidence certainly does not compel those inferences. See Bocova, 412 F.3d at 262. The BIA's adverse credibility finding therefore survives substantial evidence review.[3]

## B.    The Ineffective Assistance Claim

Given the volume of ineffective assistance of counsel claims asserted by removable aliens, the BIA has developed threshold procedural requirements to enable the screening of claims that are frivolous or collusive. See Wang v. Ashcroft, 367 F.3d 25, 27 (1st Cir. 2004). The requirements, set forth in Matter of

---

[3] Tai cites He v. Ashcroft, 328 F.3d 593, 600 (9th Cir. 2003), for the proposition that mentioning an incident at an asylum hearing that was not mentioned earlier does not constitute inconsistency for purposes of credibility analysis. But in He, the initially omitted fact was not relevant until the applicant had been asked other questions at his hearing, and therefore it made no sense to expect the applicant to have mentioned it earlier. Id. at 600-02. By contrast, where an applicant initially omits a fact crucial to his claim, the agency may consider that omission in its credibility determination.

Lozada, 19 I. & N. Dec. 637 (BIA 1988), state that a motion to reopen based on ineffective assistance must be supported by:

> (1) an affidavit describing in detail the agreement between the alien and his counsel regarding the litigation matters the attorney was retained to address; (2) evidence that the alien informed his counsel as to the alien's ineffective assistance allegations and afforded counsel an opportunity to respond; and (3) evidence that the alien had either filed a complaint with the appropriate disciplinary authority regarding the attorney's ethical or legal misfeasance, or a valid excuse for failing to lodge such a complaint.

Betouche v. Ashcroft, 357 F.3d 147, 149 (1st Cir. 2004) (citing Lozada, 19 I. & N. Dec. at 639).

In this case, Tai failed to meet any of the Lozada requirements, a fact he does not dispute. Nonetheless, he argues that the BIA erred when it ruled without reaching the merits of his ineffective assistance claim. He suggests that the BIA was obligated to inform him that he had not met the Lozada requirements and to allow him time to re-file his claim.

This argument has no merit. It is well-established that "[t]he BIA acts within its discretion in denying motions to reopen that fail to meet the Lozada requirements as long as it does so in a non-arbitrary manner." Asaba v. Ashcroft, 377 F.3d 9, 11 (1st Cir. 2004). The only question, then, is whether the BIA's application of Lozada here was arbitrary. Relying on Saakian v.

-11-

INS, 252 F.3d 21 (1st Cir. 2001), Tai argues that it was.  He suggests Saakian stands for the proposition that

> where an alien files a timely appeal and alleges facts which, if true, could be defined as ineffective assistance, the BIA . . . should invite the alien to remedy his or her claim to satisfy the Lozada requirements.

Tai's reading of the precedent is too broad.

In Saakian, this court deemed the application of Lozada arbitrary where petitioner (1) was proceeding pro se when he filed a faulty ineffective assistance motion with the IJ, id. at 26; (2) had the right to file further motions to reopen and was still within the filing deadline, id.; (3) was misled by the IJ, who implied that Saakian was foreclosed from remedying the deficiencies in his motion, id.; (4) fulfilled the Lozada requirements in his appeal to the BIA, id. at 24; and (5) was nonetheless rejected on appeal, id.  None of those factors (other than the rejection on appeal) is present here.  Indeed, as the government points out, relief at the agency level was not foreclosed by the BIA's dismissal of Tai's appeal: he could have moved to reopen any time within 90 days after the BIA order, see 8 C.F.R. § 1003.2, and he did not do so.  In short, unlike Saakian, this is not a case where petitioner "did what he was supposed to do in order to be heard on the merits" and nonetheless never received a merits hearing.  252 F.3d at 27.  Since the application of Lozada was not arbitrary, the

BIA "act[ed] within its discretion," <u>Asaba</u>, 377 F.3d at 11, and Tai's claim to the contrary fails.

**C.        The Withholding of Removal and CAT Claims**

Having disposed of each of Tai's claims with respect to asylum, we have nothing left to address.  Tai waived his CAT claim. Similarly, he makes no argument with respect to withholding of removal, and thus that claim also is waived.[4]  <u>See</u> <u>Ali</u> v. <u>Gonzales</u>, 401 F.3d 11, 14 n.3 (1st Cir. 2005).

## IV.

Since substantial evidence supports the BIA's adverse credibility finding and the BIA was within its discretion in its application of <u>Lozada</u>, Tai's petition for review is **<u>denied</u>**.

---

[4]  Had Tai not waived the withholding claim, it would fail as a matter of course given our affirmance of the denial of the asylum claim.  <u>See</u> <u>Rodriguez-Ramirez</u> v. <u>Ashcroft</u>, 398 F.3d 120, 123 (1st Cir. 2005).