In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-1717

SHOU WEI JIN,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR.,

*Respondent.*

On Petition for Review
from the Board of Immigration Appeals.
No. A078 848 890

SUBMITTED JANUARY 14, 2009—DECIDED JULY 14, 2009

Before CUDAHY, KANNE, and TINDER, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Shou Wei Jin petitions for review of the final order of the Board of Immigration Appeals affirming the Immigration Judge's denial of his claims for asylum and withholding of removal under the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* Jin, a citizen of China, asserts that he is entitled to refugee status based on the forced abortion of a woman he claims to be his wife. We disagree and deny the petition.

**I.**

Shou Wei Jin is a native and citizen of China. Until he was 18, Jin lived with his family in Fuzhou city in Fujihan province. In 2001, he paid $8,000 U.S. dollars for a fake passport and a plane ticket to the United States. He was detained at Chicago's O'Hare Airport and subsequently petitioned for asylum.

Jin alleges that he fled China when a woman named Yan Lin, whom he has described at various points as his "girlfriend," his "fiancée" and also as his "wife," was forced by the Chinese government to have an abortion. According to Jin, he and Lin exchanged promises to marry, and the couple's families held a ceremony to announce their marriage on January 2, 2001. However, because they were underage, the couple was unable to register their marriage with the Chinese government or to obtain a "birth permit."[1]

In April 2001, a routine medical examination at a local hospital revealed that Lin was pregnant. Shortly thereafter, according to Jin, she went to live with a relative in another country out of fear that she would be forced to have an abortion if her pregnancy were discovered. Jin

---

[1] The minimum age for marriage in China is 22 for males and 20 for females. People who marry before the stipulated age generally are not allowed to register the marriage or obtain permission to have children. *Lin-Zheng v. Atty. Gen.*, 557 F.3d 147, 149 n.2 (3d Cir. 2009) (citing U.S. State Department records). Jin was 18 and Lin was 19 at the time of their purported marriage ceremony.

gives the following account of what happened next: three months after the couple learned of Lin's pregnancy, government officials came to Jin's house looking for Lin and threatening to arrest Jin. When Jin learned of this visit, he stayed overnight with a friend and left Fuzhou city the following day. After consulting with his parents, Jin decided to flee for the United States. He made it as far as Chicago, where he was detained by the INS. Lin was not so lucky; she was caught by family planning authorities and forced to terminate her pregnancy.

Jin conceded removability and petitioned for asylum and withholding of removal.[2] The IJ denied Jin's petition. First, the IJ found that Jin was not actually married to Lin. Second, the IJ found that Jin had not shown that underage husbands of pregnant wives suffer persecution because of China's family planning policy. The BIA affirmed the IJ's finding that Jin and Lin were not married without comment, and also found that Jin had not shown that he had a well-founded fear of future persecution due to his resistance to China's population control policies.

---

[2] Jin also petitioned for relief under the Convention Against Torture. However, he concedes that this claim was not developed below. We therefore deny Jin's claim under the Convention Against Torture without discussion, and limit our inquiry to Jin's claim that he is a refugee.

## II.

Both asylum and withholding of removal require the petitioner to demonstrate, at a minimum, that he has a legitimate fear of persecution. However, the standard for withholding of removal is higher, requiring the petitioner to show a "clear probability" of persecution. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Zeqiri v. Mukasey*, 529 F.3d 364, 370 (7th Cir. 2008). Accordingly, we begin our analysis with Jin's asylum claim; if he cannot show that he is entitled to asylum, then *a fortiori* he cannot show that he is entitled to withholding of removal.

We review the denial of asylum for substantial evidence, upholding the denial of relief so long as it was "supported by reasonable, substantiated, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4); *Elias-Zacarias*, 502 U.S. at 481; *Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir. 2002). Where, as here, the BIA adopts the IJ's reasoning and offers additional commentary, we review the IJ's decision as supplemented by the BIA. *Binrashed v. Gonzales*, 502 F.3d 666, 670 (7th Cir. 2007).

Congress has given the Attorney General the discretionary authority to grant asylum to an alien who qualifies as a "refugee" because he or she "is unable or unwilling to avail himself or herself of the protection of [his or her native country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). At issue is whether Jin qualifies as a "refugee" entitling him to asylum under section 601(a) of the Illegal Immigration Reform and

Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208 (codified at 8 U.S.C. § 1101(a)(42)(B)), which provides:

> [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

Jin argues that he qualifies as a "refugee" under this provision because (1) he was Lin's husband, and therefore (2) Lin's persecution can be imputed to him. Jin's first claim points to troubling issues regarding the IJ's decision. However, Jin's second claim is clearly foreclosed by settled law.

As to Jin's first point, there was a fair amount of record evidence that he and Lin were not actually married. First, Lin referred to Jin as her fiancé in a letter addressed to the IJ. Second, Jin himself initially indicated that he was not married on his asylum application. Indeed, during the proceeding itself, Jin characterized his marital status as "Single, but I'm engaged." Thus, while Jin went on to testify that he was actually married to Lin and that the couple was not permitted to register their marriage because they were underage, the IJ was not required to credit this inconsistent testimony.

However, the IJ did not explicitly find that Jin's testimony that he was married to Lin was non-credible. Instead, the IJ somewhat puzzlingly held that Jin was required to prove that Chinese law recognizes the existence of common-law marriage. The IJ's conclusion—and thus, the BIA's decision adopting this conclusion—is incorrect as a matter of law. A common-law marriage is one that takes legal effect without license or ceremony. *Black's Law Dictionary* 986 (7th ed. 1999). A "traditional marriage," by contrast, occurs when a couple has a marriage ceremony but is unable to register their marriage. *E.g.*, *Zhao v. Holder*, No. 07-4117, 2009 WL 1659374, at *1 (6th Cir. June 16, 2009). "Where a traditional marriage ceremony has taken place, but is not recognized by the Chinese government because of the age restrictions in the population control measures, that person nevertheless qualifies as a spouse for purposes of asylum." *Zhang v. Gonzales*, 434 F.3d 993, 999 (7th Cir. 2006) (citing *Ma v. Ashcroft*, 361 F.3d 553, 558-61 (9th Cir. 2004)). In the present case, Jin's affidavit states that "my parents organized a small scale banquet to announce the marital union between Yan Lin and me to members of two families. From then on, Yan Lin and I started living together at our home." While the IJ was not legally required to credit this claim, he was not entitled to disregard it based on the conflation of two separate forms of marriage, or on erroneous assumptions concerning Jin's burden of proof.

Although the IJ's legal error gives us pause—and a different record may well have justified a remand—a remand would be futile in this case because Jin presented

no evidence that he personally suffered persecution as a result of China's population control policies. Instead, Jin initially suggested that he is entitled to asylum based on Lin's persecution under *Matter of C-Y-Z-*, 21 I. & N. Dec. 915 (BIA 1997) (en banc), which held that spouses of victims of forced abortions, as well as the victims themselves, are automatically eligible for asylum under IIRIRA section 601(a). *Id.* at 919-20. After Jin perfected his appeal, however, the Attorney General overruled *Matter of C-Y-Z-*. *See Matter of J-S-*, 24 I. & N. Dec. 520, 523-24 (BIA 2008) ("spouses are not entitled to the same per se refugee status that [§ 1101(a)(42)(B)] expressly accords persons who have physically undergone forced abortion or sterilization procedures."). Under the Attorney General's current policy, in order for a spouse who has not physically undergone a forced abortion or sterilization to qualify as a refugee under § 1101(a)(42)(B), he or she must show persecution or a well-founded fear of future persecution based on his or her "failure or refusal" to undergo such a procedure or "other resistance" to a coercive population control program. Id. at 537-38.

The procedural history of *Matter of J-S-* is worth recounting. Prior to IIRIRA, the BIA had held that victims of involuntary abortions and sterilizations would not be entitled to asylum "[t]o the extent . . . that such a policy is solely tied to controlling population, rather than as a guise for acting against people for reasons protected by the [INA]." *Matter of Chang*, 20 I. & N. Dec. 38, 44 (B.I.A 1989). Congress enacted IIRIRA for the express purpose of overturning this policy. *See* H.R. Rep. No. 104-469(I), at

173 (1996) ("The primary intent of [this section] is to overturn several decisions of the [BIA], principally *Matter of Chang* and *Matter of G-*.").

Understanding Congress to have intended to liberalize immigration policy for those affected by their home country's coercive population control programs, the BIA initially interpreted IIRIRA as providing per se refugee status not only to persons who have physically undergone forced abortion or sterilization procedures, but also to the spouses of such persons. *See Matter of C-Y-Z-*, 21 I. & N. Dec. at 919-20. Most circuits followed the BIA's interpretation of IIRIRA. *See, e.g., Lin-Jian v. Gonzales*, 489 F.3d 182, 188 (4th Cir. 2007); *Chen v. Gonzales*, 457 F.3d 670, 674 (7th Cir. 2006); *Hong Zhang Cao v. Gonzales*, 442 F.3d 657, 660 (8th Cir. 2006); *Tai v. Gonzales*, 423 F.3d 1, 4 (1st Cir. 2005); *Zhang v. Ashcroft*, 395 F.3d 531, 532 (5th Cir. 2004); *He v. Ashcroft*, 328 F.3d 593, 604 (9th Cir. 2003). But the Second Circuit did not, holding that the BIA's interpretation of IIRIRA was contrary to the plain language of the statute. *See Shi Liang Lin v. U.S. Dep't of Justice*, 494 F.3d 296, 314 (2d Cir. 2007) (en banc).

Ultimately, the Attorney General adopted the Second Circuit's view. Exercising his authority pursuant to 8 C.F.R. § 1003.1(h)(1)(i), the Attorney General overruled the BIA's decision in *Matter of C-Y-Z-*, 21 I. & N. Dec. 915 (BIA 1997) (en banc). Two circuits have since upheld the Attorney General's interpretation of IIRIRA. *See Lin-Zheng v. Att'y Gen.*, 557 F.3d 147, 156-57 (3d Cir. 2009) (en banc); *Yu v. U.S. Attorney General,* No. 08-16068, 2009 WL 1457102, at *4 (11th Cir. May 27, 2009).

The Attorney General's decision in *Matter of J-S-* is dispositive of the present case. In commenting on the IJ's decision here, the BIA noted that Jin's

> conduct relevant to the coercive population control policy includes impregnating his underage girlfriend, requesting a "birth control permit," and hiding when he heard that his girlfriend was taken by the cadre. [Jin] did not otherwise claim to have expressed opposition or resistance to his girlfriend's abortion or the family planning regime. "Merely impregnating one's girlfriend does not constitute an act of resistance under the family planning laws . . ."

While this commentary stretches the factual record, there is no question that Jin did not present any evidence that he suffered persecution—or that he will suffer persecution—as a result of any acts of resistance in which he engaged. For instance, there was no evidence that Jin expressed opposition to China's policies or otherwise attempted to interfere with the enforcement of those policies. *Cf. S-L-L-*, 24 I. & N. Dec. 1, 10 (BIA 2006). To the contrary, Jin himself admits that he fled rather than attempting to resist.

In his reply brief, Jin claims that the Attorney General's interpretation of IIRIRA Section 601(a) is unreasonable. However, Jin gives no real argument in support of this claim. Instead, he states in a conclusory fashion that the Attorney General's interpretation is unreasonable as an intuitive matter and inconsistent with Congress's legislative intent. Neither of these claims is adequately devel-

oped,[3] so both are waived. *See Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 852 n.6 (7th Cir. 2002). At any rate, Jin's suggestion that the Attorney General's interpretation is unreasonable is highly dubious. Two circuits have held that the Attorney General's interpretation is the *only* reasonable interpretation of IIRIRA. Thus, it seems likely that this interpretation constitutes a "permissible construction of the statute." *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843 (1984).

Jin also invites us to use our equitable power to apply the BIA's previous interpretation of IIRIRA *nunc pro tunc* to his asylum claim. However, the purpose of the *nunc pro tunc* doctrine is "to return aliens to the position in which they would have been, *but for a significant error* in their immigration proceedings." *Edwards v. I.N.S.*, 393 F.3d 299, 308-09 (2d Cir. 2004) (Calabresi, J.) (emphasis added). A change in an agency's interpretation of the law does not constitute a "significant error" that justifies the exercise of our *nunc pro tunc* powers. *See Yu*, 2009 WL 1457102, at *5 ("Once the Attorney General clarified the meaning of § 1101(a)(42)(B) in *Matter of J-S-*, that decision became the controlling interpretation of the law and was entitled to full retroactive effect in all cases still open on direct review, regardless of whether the events predated the Attorney General's decision.").

---

[3] For instance, Jin does not actually point to any legislative history that supports his claim the Attorney General's interpretation is contrary to Congress's intent.

In short, there was substantial evidence in support of the BIA's conclusion that Jin had not shown that he himself was eligible for relief under IIRIRA section 601(a). The petition for review is, therefore, DENIED.