# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NAI YUAN JIANG,
                    *Petitioner,*

          v.

ERIC H. HOLDER JR., Attorney
General,
                    *Respondent.*

No. 08-73186

Agency No.
A074-333-568

ORDER AND
OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
October 8, 2009—Pasadena, California

Filed July 14, 2010

Before: Harry Pregerson, Stephen Reinhardt and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wardlaw

10177

## COUNSEL

Helen A. Sklar, Stone & Grzegorek LLP, Los Angeles, California, and Alphan K. Tsoi, Tsoi & Associates, Monterey Park, California, for the petitioner.

Jessica Segall, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, District of Columbia, for the respondent.

## ORDER

The opinion filed May 24, 2010, slip op. 7355, is hereby withdrawn and a superseding opinion is filed herewith. No petitions for panel rehearing or rehearing en banc shall be entertained. *See* 9th Cir. G.O. 5.3(a).

## OPINION

WARDLAW, Circuit Judge:

Nai Yuan Jiang ("Jiang"), a native and citizen of the People's Republic of China, petitions for review of the Board of Immigration Appeals' ("BIA") denial of his application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). We must decide whether the

BIA's conclusion that Jiang has not demonstrated persecution for "other resistance to a coercive population control program" under the Immigration and Nationality Act ("INA") § 101(a)(42), 8 U.S.C. § 1101(a)(42), is supported by substantial evidence. Because the BIA expressly found Jiang credible, we consider whether the BIA correctly applied the law to the record before it, including Jiang's credible testimony. Because we conclude that Jiang suffered persecution for demonstrating other resistance to China's coercive population control policy, we grant the petition in part and remand to the BIA.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Jiang entered the United States on May 5, 1999, and was immediately detained. The Immigration and Naturalization Service ("INS") filed a Notice to Appear on May 18, 1999, charging him with removability for violating INA § 212(a)(6)(C)(i), 8 U.S.C. § 1182(a)(6)(C)(i). Jiang timely filed an application for asylum, withholding of removal, and CAT relief. In his application, Jiang claimed past persecution and fear of future persecution under China's coercive family planning policies and on the basis of his religion.[1]

In a hearing before the Immigration Judge ("IJ"), Jiang testified that he met his girlfriend, Siu-Jhou Jiang ("Siu-Jhou"), in high school, and that they were both expelled after they were caught holding hands, a violation of prohibitions against romantic relationships. Undeterred, they began living together in the same household in July 1998, and they began to share a room on September 5, 1998. On November 16, 1998, they decided to marry and applied for an official marriage license. Because they were both under the legal age of marriage

---

[1]In light of our conclusion that Jiang was persecuted on account of other resistance to a coercive population program, we need not reach Jiang's claim that he is entitled to asylum and withholding on the basis of religious persecution.

imposed as part of China's population control policy, local authorities denied their application for the marriage license and asked the couple if they were cohabiting. Jiang admitted that they were. Later that day, two police officers arrived at their home and seized both Jiang and Siu-Jhou. Local officials detained Jiang and subjected Siu-Jhou to a physical examination, under her protest. During the physical examination, it was discovered that she was two months pregnant. The local officials forcibly subjected Siu-Jhou to an abortion that day. Meanwhile, local authorities held Jiang in custody. They released him the next day upon payment of a 5,000 RMB fine after the abortion had been completed.

Despite the minimum age requirement for a state-recognized marriage, Jiang and Siu-Jhou decided to be married in a traditional Chinese ceremony to be held on Christmas Day, December 25, 1998. On the morning of their traditional ceremony, police and local officials from the family planning division interrupted the wedding preparations and attempted to arrest Jiang. Fearing that the police and family planning officials would detain, beat, and fine him, Jiang escaped with the help of his friend. Siu-Jhou, who had not yet arrived at the ceremony, also went into hiding.

Jiang also credibly testified that, after the raid on his traditional wedding ceremony, he retreated to Ginshi Village to stay with his friend. During this stay, Jiang attended a worship session, where he helped to prepare fliers about Christianity for public distribution. Police officers armed with batons disbanded the meeting, beating the participants. Police hit Jiang before he escaped across a nearby river; other participants were also severely beaten, including one who suffered a broken leg. After the incident, police arrested and interrogated Jiang's parents about his whereabouts and detained and beat his father.

Jiang conceded removability, and on January 21, 2003, the IJ denied his petition for asylum, withholding, and CAT

relief. Following Jiang's timely appeal, the BIA upheld the IJ's decision on April 20, 2004. The BIA found that Jiang failed to meet the burden of proof required to show persecution under *Matter of C-Y-Z-*, 21 I. & N. Dec. 915 (BIA 1997), which had established that the spouse of an individual forced to undergo an abortion is prima facie eligible for asylum. Because "the respondent and his girlfriend were underage, and therefore did not have a legally recognized marriage in China," the BIA denied Jiang's claim. The BIA also found that Jiang had not been persecuted in the past on the basis of his Christian religion and that Jiang had not proven likelihood of future persecution on these grounds.

Jiang then timely appealed to this court. Upon the government's motion, we referred the case to mediation and thereafter granted the government's unopposed motion to remand to the BIA for reconsideration. On December 27, 2006, the BIA found Jiang credible, but again denied Jiang's appeal. Citing its recent decision in *Matter of S-L-L-*, 24 I. & N. Dec. 1 (BIA 2006), the BIA held that Jiang did not suffer past persecution because he was not a legal spouse of the victim of a forced abortion, and found that he did not demonstrate "other resistance" to a coercive population program. The BIA also rejected Jiang's religious persecution claim.

Jiang subsequently filed a motion to reconsider, arguing that in *S-L-L-*, the BIA recognized that its ruling "does not mean that an unmarried applicant may never demonstrate past persecution in the context of a partner's forced abortion or sterilization." *S-L-L-*, 24 I. & N. Dec. at 10. The BIA denied his motion.

Jiang again timely appealed. In October 2007, the government again requested that we remand to the BIA for reconsideration, this time because of our decisions in *Ma v. Ashcroft*, 361 F.3d 553 (9th Cir. 2004), and *Tang v. Gonzales*, 489 F.3d 987 (9th Cir. 2007). In *Ma*, we held that an individual whose spouse was persecuted under China's population control poli-

cies, and who was married in a traditional, but not a state-recognized wedding, is eligible for asylum. In *Tang*, we held that two people living together as "husband and wife" should be treated as spouses for purposes of asylum claims based on population control policies. We again granted the government's motion to remand to the BIA.

On June 24, 2008, the BIA denied Jiang's claim for the third time, again based upon an intervening change in the law. The BIA observed that, subsequent to our remand, the Attorney General had determined that "an alien is not per se entitled to refugee status solely upon the fact that his spouse was forced to undergo an abortion or sterilization." Pursuant to *Matter of J-S-*, 24 I. & N. Dec. 520 (A.G. 2008), the BIA concluded that Jiang was not entitled to rely upon evidence of Siu-Jhou's forced abortion, failed to demonstrate any resistance to family planning policies, and failed to establish past persecution or a well-founded fear of future persecution due to such resistance. Jiang timely filed this third appeal.

## II.  JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over a final order of removal pursuant to 8 U.S.C. § 1252(a)(1). Where, as here, the BIA conducts its own review of the evidence and law rather than adopting the IJ's decision, our "review is limited to the BIA's decision, except to the extent that the IJ's opinion is expressly adopted." *Hosseini v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006). We review questions of law de novo. *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir. 1996) (en banc). We review findings of fact for substantial evidence. *Khan v. Holder*, 584 F.3d 773, 776 (9th Cir. 2009).

## III.  DISCUSSION

### A.  Agency Deference

In denying Jiang's claim, the BIA determined that a spouse or unmarried partner of a victim of forced abortion is not pre-

sumptively eligible for refugee status under *J-S-*. The BIA further concluded that Jiang had not demonstrated persecution for " 'other resistance' to a coercive population control program" as required by *J-S-* for refugee status under INA § 101(a)(42). *J-S-*, 24 I. & N. Dec. at 537-38.

**[1]** In *J-S-*, the Attorney General concluded that INA § 101(a)(42) cannot be read to confer "automatic or presumptive refugee status on the spouses of persons who have been physically subjected to a forced abortion or sterilization procedure pursuant to a foreign government's coercive population program." *Id.* at 521. The Attorney General in *J-S-* thus overruled the BIA's earlier decisions in *C-Y-Z-*, 21 I. & N. Dec. 915 (BIA 1997), which held that the spouse of an individual forced to undergo an abortion or sterilization is prima facie eligible for asylum, and *Matter of S-L-L-*, 4 I. & N. Dec. 1 (BIA 2006), which limited *C-Y-Z-* to hold that only officially recognized spouses of victims of forced abortion or sterilization benefitted from a per se finding of past persecution. *J-S-*, I. & N. Dec. at 521.

**[2]** We must first decide whether the Attorney General's most recent interpretation of INA § 101(a)(42) in *J-S-* is legally controlling. When reviewing decisions by an administrative agency, we apply *Chevron* deference. Under *Chevron*, we first ask whether the "statute is silent or ambiguous with respect to the specific issue," and if so, we then ask whether the agency's interpretation "is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

The Attorney General's conclusion in *J-S-* is contrary to our precedent in *He v. Ashcroft*, 328 F.3d 593 (9th Cir. 2003), in which we agreed with the BIA's prior decision in *C-Y-Z-*. In *He*, we affirmed the BIA's conclusion that spouses of victims of coercive population control policies are presumptively eligible for asylum under INA § 101(a)(42). However, in *National Cable & Telecommunications Ass'n v. Brand X*

*Internet Services*, 545 U.S. 967 (2005) ("*Brand X*"), the Supreme Court held that "a court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 982. The government argues that, under *Brand X*, we must defer to the agency's reinterpretation of INA § 101(a)(42) in *J-S-*. We agree.

First, we conclude that the Attorney General's interpretation of INA § 101(a)(42) is entitled to *Chevron* deference. INA § 101(a)(42) is silent as to the provision of refugee status to spouses of victims of coercive population control policies:

> The term "refugee" means (A) any person who is outside any country of such person's nationality . . . and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or (B) . . . . For purposes of determinations under this Act, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, reversal, or resistance shall by deemed to have a well founded fear of persecution on account of political opinion.

INA § 101(a)(42).

**[3]** No language in the statute explicitly denies asylum relief to spouses of victims of coercive population control pol-

icies or precludes the Attorney General from construing that statute in a manner that affords them such relief. Moreover, as the agency's new interpretation of the statute in *J-S-* indicates, the statutory language of INA § 101(a)(42) is susceptible to more than one interpretation. Although the Attorney General in *J-S-* noted that INA § 101(a)(42) "does not explicitly exclude spouses from its purview," *J-S-*, 24 I. & N. Dec. at 530, his decision in *J-S-* reverses the BIA's earlier conclusion in *C-Y-Z-*, which held that the spouse of a victim of coercive population control policies is prima facie eligible for asylum under INA § 101(a)(42). *C-Y-Z-*, 21 I. & N. Dec. 915 (BIA 1997). We conclude that INA § 101(a)(42) is silent and ambiguous as to the refugee status of spouses of victims of coercive population control policies.

**[4]** Proceeding to the second step in the *Chevron* analysis, we conclude that the agency's interpretation is based on a permissible construction of the statute. Our decision in *He* does not require us to conclude otherwise. Under *Brand X*, "[o]nly a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." *Brand X*, 545 U.S. at 982-83. We have clarified that, under *Brand X*, "[w]hile agencies retain discretion to fill ambiguous statutory gaps, it does not follow that an agency may repeatedly put forward an interpretation that we have already examined under *Chevron* and found unreasonable at its second step." *Escobar v. Holder*, 567 F.3d 466, 478 (9th Cir. 2009). Here we have no reason to hold unreasonable the agency's current view as to the presumptive eligibility of a victim's spouse.

**[5]** In *He*, we agreed with the BIA's prior decision in *C-Y-Z-* that spouses of victims of coercive population control policies are presumptively eligible for asylum under INA § 101(a)(42). However, our decision in *He* affirmed the BIA's prior position in *C-Y-Z-* without indicating that that position "follow[ed] from the unambiguous terms of the statute."

*Brand X*, 545 U.S. at 982. Because *He* thus did not unambiguously foreclose the agency's current interpretation, our prior decision does not displace the agency's new interpretation. We note that our deference to the Attorney General's new interpretation in *J-S-* is in accord with every other circuit to have addressed this issue. *See Dong v. Holder*, 587 F.3d 8 (1st Cir. 2009) (finding that *J-S-* overruled *C-Y-Z-* and *S-L-L-*); *Chen v. Holder*, No. 08-5656-ag, 348 Fed. Appx. 622 (2d Cir. Oct. 6, 2009) (same); *Wu v. Holder*, No. 08-9558, 343 Fed. Appx. 309 (10th Cir. Aug. 27, 2009) (same); *Jin v. Holder*, 572 F.3d 392 (7th Cir. 2009) (same); *Zhao v. Holder*, 569 F.3d 238 (6th Cir. 2009) (same); *Yu v. Att'y Gen.*, 568 F.3d 1328 (11th Cir. 2009) (same); *Lin-Zheng v. Att'y Gen.*, 557 F.3d 147 (3d Cir. 2009) (same).

## B.  Merits of Jiang's Political Opinion Claim

Having concluded that the Attorney General's interpretation of INA § 101(a)(42) in *J-S-* controls, we next examine whether the BIA committed legal error in concluding that Jiang failed to demonstrate "other resistance to a coercive population control program" under the statute, and whether the BIA's conclusion that Jiang did not suffer persecution on the basis of that resistance is supported by substantial evidence.

### 1.  Persecution Due to "Other Resistance to a Coercive Population Control Program"

**[6]** In *J-S-*, the BIA concluded that spouses cannot rely upon "the sole fact of their spouse's persecution automatically to qualify for political asylum under the statute's coercive population control 'resistance' provisions." *J-S-*, 24 I. & N. Dec. 534-35. The Attorney General's interpretation, however, "does not prevent the spouse of a person who has physically undergone a forced abortion or sterilization procedure from qualifying for political asylum." *Id.* at 523. Such a person

may qualify for asylum under INA § 101(a)(42) if he or she can demonstrate that

> (i) he or she qualifies as a refugee . . . on account of persecution for "failure or refusal" to undergo such a procedure or for "other resistance" to a coercive population control program; (ii) he or she has a well-founded fear of being forced to undergo an abortion or involuntary sterilization procedure or of being persecuted for failing or refusing to undergo such a procedure or for "other resistance" to a coercive population control program; (iii) the specific facts of his or her case justify asylum on grounds other than those articulated in section 601(a); or (iv) he or she satisfies the requirements for derivative asylum expressly set forth in section 208(b)(3)(A) of the Act.

*J-S-*, 24 I. & N. Dec. at 537-38.

[7] *J-S-* thus stands only for the limited proposition that INA § 101(a)(42) cannot be read to confer "*automatic or presumptive* refugee status on the spouses of persons who have physically been subjected to a forced abortion or sterilization procedure pursuant to a foreign government's coercive population program." *J-S-*, 24 I. & N. Dec. at 521 (emphasis added). Indeed, the Attorney General concluded in *J-S-* that applicants may "present proof, of which their spouse's treatment *may be a part*, of persecution for refusing to undergo forced abortion or sterilization procedures or for engaging in 'other resistance' to a coercive population control program." *J-S-*, 24 I. & N. Dec. at 535 (emphasis added). We thus consider a spouse's forced abortion or sterilization as "proof" that an applicant resisted a coercive population control policy, and in analyzing whether persecution occurred as a result. *Id.* However, an applicant must provide evidence of resistance in addition to the spouse's forced abortion or sterilization to avoid what the Attorney General described as the "fatal flaw"

in the per se eligibility analysis: "Some spouses may not have 'resisted,' and in fact may have affirmatively supported, the forced abortion or sterilization procedure that was performed on the spouse who remains in China. Such applicants should not . . . [be permitted to] use the sole fact of their spouse's persecution automatically to qualify for political asylum under the statute's coercive population control 'resistance' provisions." *Id.* at 534-35.

### a.   Other Resistance to a Coercive Population Control Program

Jiang's credible testimony amply demonstrates the "other resistance to a coercive population control program" required by *J-S-*. The BIA erred as a matter of law in concluding otherwise.

**[8]** First, Siu-Jhou's forced abortion is proof of Jiang's resistance to China's population control policy. *J-S-*, 24 I. & N. Dec. at 535. Jiang neither supported nor acquiesced in the forced abortion. Family planning officials arrested both Jiang and Siu-Jhou for cohabiting in violation of China's prohibition against underage marriage, after they had applied for a marriage license. Family planning officials then subjected Siu-Jhou to a medical examination against her will, during which they discovered that Jiang and Siu-Jhou had conceived in defiance of the population control policy, and that Siu-Jhou was two months pregnant. Officials held Jiang in detention while they subjected Siu-Jhou to an abortion. They released him the next day, after the abortion had been completed, and only after he paid a heavy fine.

**[9]** Moreover, the forced abortion took place as part of a series of events that reflect Jiang's persistent defiance of the coercive population control policy. Jiang and Siu-Jhou cohabited without having been able to marry under Chinese law, and attempted to apply for an official marriage license, which was denied them due to their underage status. Even after the

forced abortion and fine resulting from their previous viola-
tion of the population control law, Jiang and Siu-Jhou were
determined to marry in a traditional Chinese ceremony despite
the government's denial of an official marriage license. Their
continued resistance of the official policy prohibiting their
marriage was again met with violence by the local police. At
seven o'clock on the morning of the wedding, as Jiang's rela-
tives were helping to decorate for the ceremony, and as Jiang
was straightening out his wedding clothes, ten police officers
and family planning officials arrived to arrest Jiang. Jiang was
forced to flee from his home, and his bride was also forced
into hiding.

We have established that China's prohibition on underage
marriage "is an integral part" of China's coercive population
control policy. *Li v. Ashcroft*, 356 F.3d 1153,1159 n.5; *see
also Ma*, 361 F.3d at 554 (concluding same). In *Li*, we
addressed for the first time the meaning of the phrase "other
resistance to a coercive population control program." *Id.* at
1157. There, we held that a petitioner "may also be able to
demonstrate resistance to a coercive population control poli-
cy" by deciding to marry, even when denied a license by local
authorities. *Id.* at 1161.

**[10]** Jiang's acts in defiance of the coercive population
control policy fit squarely within our precedent as to the
meaning of "other resistance." Pursuant to *J-S-* and *Li*, it is
clear that Siu-Jhou's forced abortion, in which Jiang was not
a willing participant, and Jiang's continued attempts to
cohabit and marry in contravention of China's population
control policy, in the face of denial of an official marriage
license, constitute "other resistance."

### b.   Persecution

**[11]** To establish past persecution, a petitioner must dem-
onstrate (1) an incident, or incidents, that rise to the level of
persecution; (2) persecution on account of one or more of the

statutorily-protected grounds; and (3) that the persecution was committed either by the government or by forces that the government was unable or unwilling to control. *Chand v. INS*, 222 F.3d 1066, 1073 (9th Cir. 2000). Because Jiang's claim falls under persecution on the basis of political opinion, 8 U.S.C. § 1101(a)(42), and because Jiang's claim of persecution is based on actions by local police and family planning officials' enforcement of China's official population control policy, which he resisted, we address only the question of whether Jiang's experiences rise to the level of persecution. We conclude they do.

The BIA concluded that Jiang has not demonstrated past persecution or a well-founded fear of future persecution on account of his resistance to a coercive population control policy. The BIA was correct in concluding that pursuant to *J-S-*, Jiang cannot qualify for refugee status solely on the basis of Siu-Jhou's forced abortion. *J-S-* makes clear, however, that the forced abortion or sterilization imposed on one's spouse is proof of the fact that the petitioner was persecuted. *J-S-*, 24 I. & N. Dec. at 535. However, Jiang offered substantial evidence of additional persecution in support of his claim.

**[12]** We examine "the totality of the circumstances in deciding whether a finding of persecution is compelled." *Guo v. Ashcroft*, 361 F.3d 1194, 1203 (9th Cir. 2004); *see also Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir. 1998) ("The key question is whether, looking at the cumulative effect of all the incidents a petitioner has suffered, the treatment [he or] she received rises to the level of persecution."). Here, an examination of the totality of the circumstances compels a finding that Jiang was persecuted as a result of his resistance to China's coercive population control policy. Jiang was first expelled from school due to his romantic relationship with Siu-Jhou, which was legally prohibited. After attempting to obtain a marriage license from the government, local authorities detained him for over a day. Family planning authorities required him to pay a heavy fine in order to be released from

detention.[2] When Jiang resisted China's official population control policy of prohibiting underage marriage by organizing and participating in a traditional wedding ceremony, local officials and police officers arrived at his home and attempted to arrest him on the morning of the wedding. Jiang was then forced to flee his hometown and hide from authorities out of concern for his safety. *See Guo*, 361 F.3d 1194 (finding persecution under the totality of circumstances where the Chinese government detained applicant for a day and a half and coerced him into signing a document that he would no longer believe in Christianity).

[13] The BIA also erred in denying Jiang's petition because he was not a legal spouse of the victim of a forced abortion. In its decision, the BIA failed to account for our precedent establishing that China's bar on underage marriage is an integral part of its coercive population control program. *Ma*, 361 F.3d at 553; *Li*, 356 F.3d at 1159. Under this holding, whether a persecuting country would recognize a marriage is not the dispositive question in determining whether the petitioner is a "spouse," particularly where the marriage is barred by a coercive population control program. In *Ma*, we held that "because the prohibition on underage marriage is an integral part of [China's population control] policy, it would contravene the fundamental statute to deny asylum on the basis of that rule." *Ma*, 361 F.3d at 561. Thus "for couples who do not meet the age requirements to marry under population control policies, the failure to have an official marriage ceremony does not preclude male partners of women who have had forced abortions from obtaining asylum under

---

[2]In its December 2006 decision, the BIA held that the fine imposed on Jiang did not rise to the level of persecution. However, the BIA erroneously concluded that this case was controlled by *Zehatye v. Gonzales*, 453 F.3d 1182 (9th Cir. 2006) and *Gormley v. Ashcroft*, 364 F.3d 1172 (9th Cir. 2004). Unlike the petitioners in those cases, Jiang does not claim economic disadvantage as the grounds for establishing persecution. Rather, the fine that Jiang paid was part and parcel of a broader set of reprisals for his resistance to China's coercive population control policies.

§ 1101(a)(42)(B). *Tang*, 489 F.3d at 990. The Chinese government, moreover, recognizes "a wedding ceremony according to the rural customs" as a "de facto" marriage where both spouses have reached the legal age to marry. *Ma*, 361 F.3d at 557. We have therefore concluded that "the protections of section 101(a)(42)(B) apply to husbands whose marriages would be legally recognized, but for China's coercive family planning policies, and not only to husbands whose marriages are recognized by Chinese authorities." *Id.* at 561.

**[14]** Here, it is clear that Jiang is not precluded from the protections of INA § 101(a)(42)(B). Even after cohabiting, conceiving, and being denied an official marriage license on account of their age, as well as enduring a forced abortion, Jiang and Siu-Jhou expressed their clear intent and actions toward achieving a traditional marriage union. However, local police officers and family planning officials forcibly prevented Jiang and Siu-Jhou from concluding their traditional marriage ceremony as part of its enforcement of China's population control policy. Because Jiang and Siu-Jhou would have been married in accordance with their village's tradition but for this interference by local officials, and would have been married had the state not denied them a marriage license, we thus conclude that Jiang is not precluded from the protections of INA § 101(a)(42)(B), and that he may present proof of Siu-Jhou's forced abortion as a factor in establishing persecution, see *J-S-*, 24 I.& N. Dec. at 535, along with all the other acts of persecution that he suffered at the hands of Chinese officials.

**[15]** Accordingly, we find that "any reasonable adjudicator would be compelled to conclude," 8 U.S.C. § 1252(b)(4)(B), that Jiang has established past persecution on the basis of "other resistance" to China's coercive population control policy.

## C. Religious Persecution Claim

In light of the foregoing, we need not reach Jiang's religious persecution claim. We nevertheless disagree with the

government's assertion that we lack jurisdiction to review this claim. The government contends that Jiang failed to file a petition for review of the BIA's December 27, 2006, denial of relief, in which the BIA considered his religious persecution claim. The record belies this assertion. Jiang timely filed a motion for reconsideration of the BIA's December 27, 2006 decision on January 10, 2007, in which he preserved his claim of religious persecution. The motion was filed within the 30-day period required by statute. 8 U.S.C. § 1229a(c)(6); 8 C.F.R. § 1003.2(b)(1). After Jiang timely filed his appeal, the government requested that we remand his petition to the BIA for further reconsideration "in light of the circumstances of this case." We remanded the petition in full to the BIA, which then neglected to address Jiang's religious persecution claim. Jiang properly briefed the issue before our court on this appeal. Thus, we have jurisdiction over his religious persecution claim. We do not, however, determine whether the BIA erred in finding that Jiang failed to establish persecution on the basis of his religious practice for purposes of his asylum, withholding, and CAT petition.

## IV.  CONCLUSION

**[16]** We defer to the Attorney General's interpretation of INA § 101(a)(42)(B) in *J-S-*. Under *J-S-*, a spouse of an individual who has undergone forcible abortion or sterilization may present proof of such treatment to evidence persecution. We reaffirm that, for the purposes of INA § 101(a)(42), a spouse includes an individual whose marriage would be recognized but for the enforcement of China's coercive population control policy, as well as an individual whose marriage is officially recognized by Chinese authorities. Because any reasonable adjudicator would be compelled to conclude that Jiang established past persecution for "other resistance" to the population control policy, we conclude that Jiang is entitled to the protections of INA § 101(a)(42)(B). Accordingly, we grant the petition for review and remand to the BIA, which shall, on behalf of the Attorney General, exercise discretion

regarding whether to grant asylum. *See Ding v. Ashcroft*, 387 F.3d 1131, 1140 (9th Cir. 2004); *Li*, 356 F.3d at 1160. We remand for further proceedings on whether Jiang is eligible for withholding of removal and CAT relief.

Petition GRANTED and REMANDED.